UNITED STATES of America

v.

**John D. EHRLICHMAN, Appellant.**

No. 74–1882.

United States Court of Appeals,
District of Columbia Circuit.

Argued 18 June 1975.

Decided 17 May 1976.

Certiorari Denied Feb. 22, 1977.
See 97 S.Ct. 1155.

William Snow Frates and Andrew C. Hall, Miami, Fla., for appellant John Ehrlichman.

Philip B. Heyman, Sp. Asst. to the Special Prosecutor, with whom Henry S. Ruth, Jr., Special Prosecutor, Peter M. Kreindler, Counsel to the Special Prosecutor, Maureen E. Gevlin, Jay B. Stephens and Richard D. Weinberg, Asst. Sp. Prosecutors, Washington, D.C., were on the brief for appellee.

Leon Jaworski, Special Prosecutor, at the time the record was filed, Washington, D.C., entered an appearance as Special Prosecutor.

Ivan Michael Schaeffer, Atty., Dept. of Justice, Washington, D.C., filed a memorandum on behalf of the U.S. as amicus curiae.

Before LEVENTHAL and WILKEY, Circuit Judges and MERHIGE,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by Circuit Judge WILKEY.

Concurring opinion filed by Circuit Judge LEVENTHAL, joined by Judge MERHIGE.

WILKEY, Circuit Judge:

On 7 March 1974 the appellant, John D. Ehrlichman, was indicted and charged with conspiracy in violation of the civil rights of Dr. Louis J. Fielding (Count I),[1] making a false statement to agents of the Federal Bureau of Investigation (Count II),[2] and three counts of perjury (Counts III–V).[3] Also indicted, on the conspiracy charge alone, were G. Gordon Liddy, Bernard Barker and Eugenio Martinez.[4] The trial commenced on 26 June 1974; on 12 July the jury returned a verdict of guilty as to Counts I–IV and not guilty as to Count V. Subsequently, the trial court entered a

judgment of acquittal with respect to Count II. This appeal, therefore, is addressed to Ehrlichman's conviction on Counts I, III, and IV, conspiracy and perjury.

## I. FACTUAL BACKGROUND AND ISSUES

The publication of the "Pentagon Papers"[5] in the summer of 1971 spurred the President to form a "Special Investigations" or "Room 16" unit within the White House, whose purpose was to investigate the theft of the Pentagon Papers and prevent other such security leaks. Defendant Ehrlichman, who was the Assistant to the President for Domestic Affairs, exercised general supervision over the unit; Egil Krogh and David Young were charged with its operation. At the time, Krogh was an assistant to Ehrlichman; Young worked with the National Security Council. They sought, and received, Ehrlichman's approval to add G. Gordon Liddy, a former F.B.I. agent, and E. Howard Hunt, a former C.I.A. agent, to the unit.

Appellant's brief describes the activity of the unit, insofar as pertinent, as follows (Br. 6–8): The unit's principal enterprise seemed to be the acquisition of all files and source material on Daniel Ellsberg. There was a generalized concern over his motives for releasing classified materials (the Pentagon Papers). Young and Krogh instructed the CIA to do a psychological profile on Ellsberg. Since Dr. Fielding had refused an interview by the FBI on the ground of doctor/patient confidentiality, Hunt suggested examining Dr. Fielding's file on Ellsberg, and further suggested a "black bag job" (surreptitious entry) while noting that the FBI no longer engaged in such activities. When Young reviewed the psychological assessment on Ellsberg prepared by the CIA, he determined that it was superficial,

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. 18 U.S.C. § 241.

2. 18 U.S.C. § 1001.

3. 18 U.S.C. § 1623.

4. The appeals of these co-defendants are treated in separate companion opinions, also handed down today.

5. See New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

and recommended that a "covert operation be undertaken to examine all the medical files held by Ellsberg's psychoanalyst." The exhibit reflects Ehrlichman's approval of the recommendation with his addition: "Provided that it is not traceable back to the White House." [6]

The members of the unit were clear that the "covert operation" in question would be a surreptitious entry into Dr. Fielding's office. Ehrlichman's primary defense at trial, however, was that he was not apprised of, and thus did not authorize, such an entry. He testified that he thought he had approved only a conventional private investigation, involving no surreptitious search of Dr. Fielding's office. Considerable evidence was introduced on both sides of the question. The jury's guilty verdict on the conspiracy Count I reflected a finding that Ehrlichman had in fact authorized the search.

Krogh and Young insisted that no one employed by the White House was to effect the actual entry into Fielding's office. Hunt traveled to Miami in mid-August 1971 to enlist the assistance of Bernard Barker, who had worked under Hunt during the Bay of Pigs operation. Hunt was widely known and respected in Miami's Cuban-American community as a government agent who had been a leader in the fight to liberate Cuba. He did not identify the object of the search, but told Barker only that the operation involved a traitor who had been passing information to the Soviet Embassy. On the basis of this information Barker recruited two men, Eugenio Martinez and Felipe de Diego, for the operation.

Hunt and Liddy met Barker, Martinez, and de Diego in Los Angeles on 2 September 1971. The Miamians were informed their mission was to enter Dr. Fielding's office, that Dr. Fielding was not himself the subject of the investigation, but that they were to photograph the file of one of his patients (they were not told Ellsberg's name until minutes before the break-in) and return the file to its place. On 3 September Barker and de Diego, dressed as deliverymen, delivered a valise containing photographic equipment to Dr. Fielding's office, enabling them at the same time to unlock the door to facilitate subsequent entry. Later that evening they and Martinez, contrary to expectations, found both the building and Dr. Fielding's office locked. The Miamians forced their way into the building, broke the lock on the office door, and used a crowbar on Dr. Fielding's file cabinets. As instructed if this became necessary, they spilled pills and materials about the office to make it appear that the break-in was the work of a drug addict. Throughout the operation surgical gloves were used to avoid fingerprint detection. In spite of all efforts, Ellsberg's records eluded them.

After relating the details of the entry and their lack of success to Hunt, Barker,

---

6. The Government brief notes that the reasons for interest in Ellsberg's psychiatric records "were, at best mixed" (p. 10). It refers (pp. 16–17) to Young's memorandum to Ehrlichman of 26 August (G.Ex. 17) as clearly indicating that the fruits of the entry were not to be used simply to determine Ellsberg's mental state. That memorandum proposes a meeting "to determine an overall game plan," which would address issues including "(9) How quickly do we want to try to bring about a change in Ellsberg's image?" A footnote adds: "In connection with issue (9), it is important to point out that with the recent article on Ellsberg's lawyer, Boudin, we have already started on a negative press image for Ellsberg. If the present Hunt/Liddy Project is successful, it will be absolutely essential to have an overall game plan developed for its use in conjunction with the Congressional investigation." On 27 August Ehrlichman sent a memorandum to Charles Colson stating: "On the assumption that the proposed undertaking by Hunt and Liddy would be carried out, and would be successful, I would appreciate receiving from you by next Wednesday a game plan as to how and when you believe the material should be used." (G.Ex. 18.) At the trial Young testified that part of the purpose in examining Fielding's files was to obtain information that could be made public through Congressional investigations, hearings or by release to the newspapers (Tr. 1179). The "Boudin materials," item (4) on Young's list, was an article prepared by Hunt containing derogatory information on Ellsberg's attorney, Leonard Boudin, which Ehrlichman forwarded on 24 August to Colson, who in turn leaked it to a reporter for the Detroit News. (Tr. 988, 1934; G.Ex. 15, 27.)

Martinez, and de Diego returned to Miami. Hunt and Liddy returned to Washington, where they reported the failure of the operation to Krogh and Young. Krogh relayed that information to Ehrlichman.[7]

White House involvement in the break-in remained unknown for almost two years. When the facts about the operation began to surface, however, on 14 March 1973 Ehrlichman was called before the grand jury to testify about his knowledge of the affair. He stated that he had not been aware prior to the break-in that the Room 16 unit was looking for information with which to compose a psychological profile of Ellsberg, and had had no advance knowledge that an effort was to be made to get such information from Dr. Fielding. One year later he was indicted, subsequently tried and convicted, for his role in authorizing the break-in and for his efforts to conceal his involvement by lying to the grand jury.

Ehrlichman raises on appeal two substantive challenges to his conviction under 18 U.S.C. § 241 of conspiracy to violate the Fourth Amendment rights of Dr. Fielding. The first is that the break-in, although conducted without a judicial warrant, did not violate the Fourth Amendment, because it was undertaken pursuant to the President's delegable constitutional prerogative in the field of foreign affairs to authorize such a search. The second argument is that even if the search was unjustified in either law or fact and thus illegal, the Special Prosecutor failed to meet his burden under section 241 of proving Ehrlichman acted with a "specific intent" to interfere with Dr. Fielding's constitutional rights. As we interpret the case law surrounding section 241, the first issue—that of the applicability under these circumstances of the "foreign affairs" exemption to the warrant requirement—is bound up in the second. They will be discussed together in Part II below.

■■■ Ehrlichman does not challenge his conviction of two counts of perjury on substantive grounds relating particularly to those counts or to the law of perjury. He does, however, attack his conviction as a whole—both for conspiracy and for perjury—on a number of grounds relating to the fairness of the trial and certain of the District Court's procedural rulings. His principal argument is that he was denied a fair trial, in the light of prejudicial pre-trial publicity, when the court failed to dismiss the indictment, continue or change the venue of the trial, or conduct a voir dire adequate to eliminate possibly prejudiced jurors. Our close examination of the procedures followed by the trial judge has satisfied us that he properly made the determinations required of him under the controlling decisions of this court.[8]

---

7. When Krogh and Young received the full report on the break-in, including pictures that had been taken showing some damage to Dr. Fielding's office, they testified they were surprised and distressed. They had expected an operation which would leave no sign of the entry and search. When Krogh described what had happened to Ehrlichman, he also expressed surprise and stated that their actions had been excessive. He stated at trial, "It was just totally out in left field from anything I had contemplated." Tr. 2016. *See* note 62 *infra*.

8. As to change of venue, " '[t]he ultimate question . . . is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination.' It is then, and more usually only then, that a fully adequate appraisal of the claim can be made, and it is then that it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch,* 131 U.S.App.D.C. 254, 261, 404 F.2d 1231, 1238–39 (1967) (footnotes and citations omitted), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968).

A pattern of bitter prejudice throughout the community can render the voir dire an unsatisfactory device for selection of an impartial jury. *See e. g., Irvin v. Dowd,* 366 U.S. 717, 727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), discussed in *United States v. Liddy,* 166 U.S.App.D.C. 95, 101, 509 F.2d 428, 435–36 (1974), *cert. denied* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975). Under our ruling in *Jones v. Gasch,* we look to the results of the voir dire for indication of any "pattern of deep and bitter prejudice" that would bring into question the veracity and reliability of the jurors' representations of impartiality. An examination of the voir dire process and its results in this case makes clear that the extreme circumstances condemned by the Supreme Court in *Irvin* and in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663

■ Subsidiary arguments advanced by Ehrlichman against the conduct of the trial are levelled at the District Court's decision not to sever Ehrlichman's prosecution from that of his co-defendants, the court's refusal to order certain discovery Ehrlichman claimed was important to his defense, and the court's failure to require then-President Nixon to testify or to respond to detailed interrogatories propounded by Ehrlichman.[9] These issues we take up in Part III.

## II. GOOD FAITH AS A DEFENSE TO "SPECIFIC INTENT" UNDER 18 U.S.C. § 241

■ The most substantial argument advanced by defendant Ehrlichman on appeal from his conviction under 18 U.S.C. § 241 [10] is that the District Court's mistaken legal view of the statute's "specific intent" requirement led the court to commit reversible error, both in ruling on the admissibility of certain evidence sought to be introduced

(1963), are not present here. After some general questions the trial judge eliminated some veniremen and examined the remaining prospective jurors individually to elicit any knowledge each might have about the case. Counsel were invited to propose additional questions, and all but Ehrlichman's counsel took advantage of that opportunity. The trial judge asked questions to determine whether the juror, as a result of news coverage, had any notion of who the parties were and what Watergate in general or the Fielding incident in particular was about. If the juror seemed to have any knowledge of the case, the trial judge then explored the type and source of information the juror had heard and remembered. The voir dire revealed that the array as a group neither was generally aware of the facts of the break-in nor had formed opinions about the defendants. A panel of approximately 120 veniremen was questioned about publicity; all thirteen who indicated they had an unfavorable opinion about the defendants were excused.

As to the jurors and alternates selected to serve none had expressed an opinion about the defendants' guilt, although one had heard that there had been a break-in by someone and another had heard that Ehrlichman was "involved" (Tr. 394–97). Few of the jurors selected had more than a faint awareness of the Fielding-Ellsberg matter, and none expressed any particular interest in Watergate. None were challenged for cause by the defendants.

The law does not require that jurors be totally ignorant of the facts and issues involved in a case. See *Irvin*, 366 U.S. at 722–23, 81 S.Ct. 1639; *Liddy*, 509 F.2d at 437. The trial court's examination here adequately probed the question of prejudice and enabled the defendants to ascertain—within limits of reasonableness, and necessary adequacy—what the prospective jurors had heard about the case and the extent to which they might have made preliminary determinations about guilt or innocence. That examination did not reveal a deep seated prejudice against defendants that would make the voir dire procedure suspect.

Similarly, a continuance in the circumstances at bar is not required by *Delaney v. United States*, 199 F.2d 107 (1st Cir.1952), where legis-

lative hearings were held concerning the criminal activity to be tried. In this case, unlike *Delaney*, the Senate Watergate hearings occurred almost a year before the trial commenced and the defendants were not under indictment at the time of the hearings. It was therefore entirely proper to rely on the voir dire to determine whether there was any significant risk to a fair trial as a result of pre-trial publicity. The voir dire showed that no such risk existed and that an impartial jury could be empanelled.

9. Ehrlichman also raises the argument that the trial judge, by gestures and facial expressions, indicated his disbelief of the testimony of the defendant and other defense witnesses, so as to unduly prejudice the jury against the defendant. We find no support for this argument in the trial record. Defense counsel made no objection at trial to any allegedly prejudicial action of the trial judge, and he details no such conduct to this court. *See Billeci v. United States*, 87 U.S.App.D.C. 274, 282, 184 F.2d 394, 402 (1950). Moreover, the trial court specifically instructed the jury to disregard any mannerisms of his that they might have interpreted as indicating a position on any of the facts to be decided. Tr. 2508–09. In view of the foregoing, Ehrlichman's attack on the impartiality of the trial judge's demeanor must be dismissed as frivolous.

10. Section 241 provides:

If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment or any right or privilege so secured—

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life. 18 U.S.C. § 241 (1972).

by him and in instructing the jury on the basic elements of the offense. Not every conspiracy affecting a citizen's constitutional rights falls within the prohibition of section 241. It is settled law that "the offender must act with a specific intent to interfere with the federal rights in question . . . .."[11] Ehrlichman contends that he acted without the requisite "specific intent" to invade Dr. Fielding's Fourth Amendment rights, since he agreed to a search of the doctor's office in the good faith belief that it would involve no violation of the law, constitutional or otherwise.[12]

Prior to trial Ehrlichman and his co-defendants presented this theory of the case to the District Court in connection with motions for discovery of certain national security information.[13] They took the position that the information would provide factual support for their asserted belief in the legality of the Fielding operation. The District Court rejected the defendants' theory, and their motions, in the following language:

Defendants contend that, even if the break-in was illegal, they lacked the specific intent necessary to violate section 241 because they reasonably *believed* that they had been authorized to enter and search Dr. Fielding's office. As explained above, however, such authorization was not only factually absent but also legally insufficient, and it is well established that a mistake of law is no defense in a conspiracy case to the knowing performance of acts which, like the unauthorized entry and search at issue here, are *malum in se.* [Cites] As the Supreme Court said in *Screws v. United States,* 325 U.S. 91, 106, 65 S.Ct. 1031, 1037, 89 L.Ed. 1495 (1945), "[t]he fact

that the defendants may not have been thinking in constitutional terms is not material [to a charge under § 242, a related specific intent statute,] where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution." Here, defendants are alleged to have intended to search Dr. Fielding's office without a warrant, and their mistaken belief that such conduct did not offend the Constitution would not protect them from prosecution under section 241. *See also Williams v. United States,* 341 U.S. 97, 101–102, 71 S.Ct. 576, 95 L.Ed. 774 (1951).[14]

As a result of the District Court's ruling, Ehrlichman was restricted during the trial in his ability to obtain and introduce evidence of the national security circumstances surrounding the Fielding operation. At the end of the trial, the court rejected jury instructions which provided that belief in the legality of one's conduct could negate "specific intent" under section 241, and advised the jury that the requisite intent would be established under section 241 if the Prosecutor showed simply "that the object of the conspiracy and the purpose of each defendant was to carry out a warrantless entry into and search of Dr. Fielding's office without permission."[15]

■ The trial judge's position, as set forth in both his pre-trial opinion and in his instructions to the jury, unquestionably states the law with regard to the vast majority of criminal conspiracies. Even though all such conspiracies are crimes of "specific intent"—in that the defendant must not only combine with others but also intend to commit unlawful acts[16]—generally there is no requirement that the conspir-

11. *United States v. Guest,* 383 U.S. 745, 753–54, 86 S.Ct. 1170, 1175, 16 L.Ed.2d 239 (1966), citing *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) and *United States v. Williams,* 341 U.S. 70, 93–95, 71 S.Ct. 581, 95 L.Ed. 758 (1951) (Douglas, J., dissenting).

12. *See* note 62 *infra.*

13. *United States v. Ehrlichman,* 376 F.Supp. 29 (D.D.C.1974).

14. *Id.* at 35.

15. Tr. 2525.

16. *See* Perkins on Criminal Law 629 (2nd ed. 1969).

ator know those acts to be unlawful.[17] A mistake as to the legality of the prohibited activity, therefore, is no defense.[18]

▮▮ The doctrine that a mistake of law will not excuse a crime normally applies in conspiracy cases even when the target offense itself has "specific intent" as an element.[19] The reason for this is that the mental state required for most "specific intent" offenses does not involve knowledge of illegality.[20] If the recognition of the unlawfulness of one's action is not an element of the substantive crime, neither is it a component of the offense of agreeing to commit the crime.

Significantly, however, some "specific intent" crimes can be committed only if the defendant performs the *actus reus* with an intention to violate the law, or without ground for believing his action is lawful. A good faith mistake as to the legality of his activity, or failure to act, is a valid defense to prosecution for such a crime.[21] Equally important, such a mistake necessarily also constitutes a defense to a charge of conspiracy to commit this kind of "specific intent" crime.

In sum, whether the District Court properly rejected the good faith defense proffered by Ehrlichman is a question whose answer rests, in the first instance, on the *mens rea* required to commit the target offense under section 241. We examine the nature of that section's "specific intent" requirement in Subsection A and apply our legal findings to the facts surrounding the Fielding break-in in Subsection B, *infra.* Our conclusion is that under the circumstances of this case the District Court did not err in rejecting the defendant's good faith defense.[22]

### A. The "Specific Intent" Requirement of Section 241

#### 1. *Screws v. United States*

The substantive counterpart to section 241 is 18 U.S.C. § 242, which provides in pertinent part:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant . . to the deprivation of any rights, privileges, or immunities secured or protected by

**17.** "Thus, an agreement to do an act that, unknown to the parties, is a crime, is criminal." Williams, Criminal Law: The General Part 678 (2nd ed. 1961). As the District Court recognized, however, knowledge of the illegality of the target offense *has* been construed as a necessary element of conspiracy when the offense was not "malum in se." *See* text accompanying note 14,*supra*; Perkins, *supra* note 16, at 630–31; Williams, *supra*, at 288 n.4. This exception is not relevant here, since an unauthorized entry and search is clearly *malum in se*.

**18.** There are a number of limited, situational exceptions to this general rule. *See generally* Williams, *supra* note 17, at 293–345; Hall & Seligman, *Mistake of Law and Mens Rea,* 8 U.Chi.L.Rev. 641 (1941). Barker and Martinez invoked such an exception in the lower court, independent of the "specific intent" requirement of section 241, based upon their claim of reasonable reliance on Hunt's authority to organize the break-in. This issue is taken up in our opinions in Nos. 74–1883 and 74–1884, 178 U.S.App.D.C. ——, 546 F.2d 940.

**19.** It is conventional doctrine that a conspiracy to commit a burglary is not excused because it is carried out in the erroneous belief that the action taken is legal. For differing views for

exceptional circumstances see Wilkey, J., dissenting in *United States v. Barker,* 168 U.S. App.D.C. 312, 514 F.2d 208, 263–70 (1975).

**20.** *See* Perkins, *supra* note 16, at 762–64.

**21.** See, e. g., *United States v. Murdock,* 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933) (defendant could not be convicted for criminal violation of tax laws if he acted in good faith belief his conduct was lawful); *People v. Weiss,* 276 N.Y. 384, 12 N.E.2d 514 (1938) (good faith belief in legality of civil arrest was defense to kidnapping charge where statute required intent to act "without authority of law"). See *United States v. Barker,* 168 U.S. App.D.C. 312, 338, 369, 514 F.2d 208, 234, 265 (1975) (Bazelon, C. J., concurring and Wilkey, J., dissenting).

**22.** In our opinions in *United States v. Barker and Martinez,* Nos. 74–1883 & 74–1884, 178 U.S.App.D.C. ——, 546 F.2d 940 we take up an alternative good faith defense proffered by defendants Barker and Martinez, based not upon the particular requirements of section 241, but upon their claim of reasonable reliance on apparent authority.

the Constitution or laws of the United States, . . . shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

The seminal case dealing with the element of *mens rea* under section 242 is *Screws v. United States*.[23] The defendants in *Screws*, law enforcement officials who had beaten a prisoner to death, were charged with denying that individual various of his due process rights under the Fourth Amendment. They countered with an attack on the constitutionality of section 242—arguing that if it incorporated such a large body of changing and uncertain law as surrounds the concept of due process, the statute lacked the basic specificity essential to criminal statutes under our legal system.[24]

The Court acknowledged that this "vagueness" challenge would be serious if the "customary standard" of guilt for statutory crimes were applied under section 242.[25] The presence of the term "willfully" in the statute, however, afforded the Court, a convenient means for narrowing its potential reach—not only to fulfill the constitutional requirement of specificity but also to prevent the federal statute from becoming a "catchall" which might interfere with the traditional law enforcement role of the states.[26] The Court noted, first, that precise construction of the word "willful" in a statute was dependent on its context. "But 'when used in a criminal statute it generally means an act done with a bad purpose.' "[27] It requires a particular intent in addition to the performance of the act required by the statute.

The Court determined that for the purposes of section 242 acting "willfully" meant acting with "a purpose to deprive a person of a specific constitutional right,"[28] "made definite by decision or other rule of law."[29] Such a construction, in the Court's view, would cure the problem of vagueness presented by the statute:

One who does act with such specific intent is aware that what he does is precisely that which the statute forbids. He is under no necessity of guessing whether the statute applies to him . . . for he either knows or acts in reckless disregard of its prohibition of the deprivation of a defined constitutional or other federal right. . . . The Act would then not become a trap for law enforcement agencies acting in good faith. "A mind intent upon willful evasion is inconsistent with surprised innocence." *United States v. Ragen*, [314 U.S. 513, 524, 62 S.Ct. 374, 378, 86 L.Ed. 383 (1942).][30]

The Court observed that the indictment in *United States v. Classic*,[31] an earlier case involving section 242, met the test of "specific intent" it had just laid down. That indictment charged the defendants with, *inter alia*, the willful alteration of ballots. Such alteration, the Court emphasized, clearly breached a right expressly guaranteed by the Constitution—*viz.*, the right to vote. The indictment did not charge that the defendants had acted with the specific intent to deprive voters of their constitu-

**23.** 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

**24.** *Id.* at 94–96, 65 S.Ct. 1031.

**25.** *Id.* at 96, 65 S.Ct. 1031. That standard was defined by the Court as follows:
"If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent."
*Ibid.*, quoting Mr. Justice Holmes in *Ellis v. United States*, 206 U.S. 246, 257, 27 S.Ct. 600, 601, 51 L.Ed. 1047 (1907).

**26.** 325 U.S. at 105, 65 S.Ct. 1031.

**27.** *Id.* at 101, 65 S.Ct. at 1035, *quoting United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381 (1933).

**28.** 325 U.S. at 101, 65 S.Ct. at 1035.

**29.** *Id.* at 103, 65 S.Ct. at 1036.

**30.** *Id.* at 104, 65 S.Ct. at 1036.

**31.** 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).

tional prerogatives. Nevertheless, the Court concluded:

> Such a charge is adequate since he who alters ballots or without legal justification destroys them would be acting willfully in the sense in which [§ 242] uses the term. *The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution. When they so act they at least act in reckless disregard of constitutional prohibitions or guarantees.*[32]

Turning to the charge against the defendants in *Screws* itself, the Court observed, "Likewise, it is plain that basic to the concept of due process of law in a criminal case is a trial—a trial in a court of law, not a 'trial by ordeal.' "[33] No allegation of intent to breach a constitutional right, therefore, was necessary. The Court held that the "specific intent" requirement of section 242 would be met if the jury were instructed simply that to convict they must find the defendants had beaten their prisoner to death with the particular purpose of subjecting him to a trial by ordeal.[34]

### 2. *The Meaning of* Screws

Although some of the language in *Screws* can be read more broadly, its holding essentially sets forth two requirements for a finding of "specific intent" under section 242. The first is a purely legal determination. Is the constitutional right at issue clearly delineated and plainly applicable under the circumstances of the case? If the trial judge concludes that it is, then the jury must make the second, factual, determination. Did the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that federal right? If both requirements are met, even if the defendant did not in fact recognize the unconstitutionality of his act, he will be adjudged as a matter of law to have acted "willfully"—*i. e.*, "in reckless disregard of constitutional prohibitions or guarantees."

These "specific intent" requirements, grafted by the Supreme Court onto the elements of a section 242 violation, met the Court's twin concerns of vagueness and federalism in *Screws*. On the one hand, the requirement that the constitutional right in question be clearly established provides the specificity needed for a criminal statute to meet minimal standards of due process. On the other hand, the requirement that the defendant have a purpose to infringe federally protected interests preserves the states' traditional prerogative to prosecute and punish those who commit ordinary crime. For example, as *Screws* illustrates, the Constitution clearly grants protection to a citizen's interests in not being punished by governmental officials without a trial. There is no violation of section 242, however, if a sheriff and his deputies commit a murder for purely personal, nongovernmental reasons. The state can, and should, deal with such crime. Section 242 comes into play only if the object of the murder was to punish a prisoner for past illegal acts, or for some other purpose stemming from the official position of those committing the homicide.

The same principles apply to prosecutions for conspiracy under section 241. Although the language of sections 241 and 242 is somewhat different—indeed, section 241 does not contain the word "willfully"[35] —the Supreme Court has made clear since *Screws* that the "specific intent" requirements of section 242 are equally applicable (or derivatively applicable) to section 241.[36]

---

**32.** 325 U.S. at 106, 65 S.Ct. at 1037 (emphasis added).

**33.** *Id.*

**34.** *Id.* at 107, 65 S.Ct. 1031.

**35.** *See* note 10 *supra.*

**36.** *See United States v. Price*, 383 U.S. 787, 806 n.20, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Logically, such an extension of the "specific intent" requirement to section 241 was necessary to avoid the same charge of vagueness levelled against section 242 in *Screws.*

In *United States v. Guest*,[37] decided in 1966, the Court reversed the dismissal of an indictment charging the defendants with violating section 241 by, *inter alia*, conspiring to intimidate blacks in the free exercise of the right of interstate travel. The Court observed, first, that the rights of equal utilization of public facilities and freedom of travel had been firmly established and repeatedly recognized; therefore, the requirement of constitutional clarity presented no difficulty.[38] Second, the Court noted with reference to the right to travel that under *Screws* not every criminal conspiracy which incidentally interfered with that right is prohibited by section 241. A conspiracy to rob a private person who happens to be traveling interstate, for example, would not violate section 241, because it would entail no purpose to invade federally protected interests.[39] On remand, therefore, the Court found that the prosecution would have to show the defendants conspired to intimidate an individual *because* he was traveling interstate.[40]

Most recently, in *Anderson v. United States*,[41] decided in 1974, the Court reaffirmed and further elucidated the "specific intent" requirements of section 241. Since the constitutional right in question was the right to an equal vote in a federal election, the defendants convicted of casting false votes could not be assailed on the ground that the federal interests involved were not clear and firmly established.[42] Rather, the main issue was whether an intent to invade those federal interests had been proven, in view of the fact that the primary objective of the conspiracy was to influence a local election—even though false votes had been cast for candidates for federal office as well. The Court found adequate evidence of "specific intent," concluding:

> A single conspiracy may have several purposes but if one of them—whether primary or secondary—be the violation of federal law, the conspiracy is unlawful under federal law.

> \* \* \* \* \* \*

> That petitioners may have had no purpose to change the outcome of the federal election is irrelevant. The specific intent required under § 241 is not the intent to change the outcome of a federal election, but rather the intent to have false votes cast and thereby injure the right of all voters in a federal election to express their choice of a candidate and to have their expressions of choice given full value and effect, without being diluted or distorted by the casting of fraudulent ballots.[43]

■ *Screws* and its progeny thus compel the conclusion that the specific intent required to violate section 241 is the purpose of the conspirators to commit acts which deprive a citizen of interests in fact protected by clearly defined constitutional rights. If that purpose was present, there is no "good faith" defense, such as Ehrlichman proffers, because of lack of awareness of the conspirators at the time they commit the proscribed acts that they are violating constitutional rights. There is no requirement under section 241 that a defendant recognize the unlawfulness of his acts.

■ It should be added here that there is also no support for Ehrlichman's position in any of the recognized common law exceptions to the mistake of law doctrine, which

37. 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239.

38. *Id.* at 753–54, 757–59, 86 S.Ct. 1170.

39. *Id.* at 760, 86 S.Ct. 1170.

40. It seems clear that a purpose to commit acts designed to interfere with his interstate travel was sufficient; the Court did not suggest that the defendants would have had to be thinking in terms of the constitutional right to travel which the courts have found in the interstices

of the Constitution. *See* Part III of the writer's opinion in *United States v. Barker and Martinez*, Nos. 74–1883 & 74–1884, —— U.S.App. D.C. ——, 546 F.2d 940.

41. 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20.

42. *Id.* at 226, 94 S.Ct. 2253.

43. *Id.*

are developed more fully in our opinions in the companion decision on Barker and Martinez. Ehrlichman's reliance on *Pierson v. Ray* [44] is misplaced. In *Pierson* the Supreme Court held that a police officer sued under 42 U.S.C. § 1983 for an unlawful arrest could raise as a defense his reliance on a statute which he *reasonably* believed to be valid but which was later held unconstitutional. Assuming *arguendo* that an analogous defense should be made available in a criminal case,[45] it still cannot avail the defendant here. As is detailed in Subpart II.B., *infra*, the violation of the Fourth Amendment in this case was clear. Ehrlichman cannot and does not argue that he should be allowed a defense based upon his reasonable reliance on an apparently valid statute or judicial decision, nor does his invocation of the claimed foreign affairs exception to the warrant requirement avail him, for even the claim of a foreign affairs exception has consistently been conditioned on specific approval by the President or the Attorney General. Ehrlichman was himself a high government official. He does not contend that specific judicial or Presidential approval was obtained for the Fielding break-in. He simply asserts that it was his belief that the break-in was lawful notwithstanding the absence of any such specific approval. Such a mistake of law can be no defense. Neither *Pierson* nor any other authority countenances an exception to the mistake of law doctrine in such a situation.

It still remains to determine whether the instructions the court gave the jury met the two-pronged test of "specific intent" laid down in *Screws*. We turn now to this inquiry.

**44.** 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

**45.** *See* Model Penal Code § 2.04.

**46.** *Gouled v. United States*, 255 U.S. 298, 304, 41 S.Ct. 261, 65 L.Ed. 647 (1921), *quoted in Coolidge v. New Hampshire*, 403 U.S. 443, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

**47.** *See, e. g., Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971);

**B.** *Conformity of Jury Instructions with "Specific Intent" Requirements*

**1.** *The Requirement that the Protected Right Be Firmly Established and Plainly Applicable*

Defendant Ehrlichman is charged with violating Dr. Fielding's Fourth Amendment rights by conspiring in the breaking and entering of his office. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Although the best means of protecting this right against incursions by "overzealous executive officers" [46] has been subject to some debate,[47] the core meaning of the Fourth Amendment was clear well before defendants conspired to search Dr. Fielding's files:

> [T]ranslation of the abstract prohibition against "unreasonable searches and seizures" into workable guidelines for the decision of particular cases is a difficult task . . . .. Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant. . . . [48]

*United States v. United States District Court (Keith)* capsulized that historic approach in noting that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." [49] "The very heart of the Fourth

*Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

**48.** *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

**49.** 407 U.S. 297, at 313, 92 S.Ct. 2125, at 2134, 32 L.Ed.2d 752 (1972).

Amendment directive"[50] is that "where practical, a government search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation."[51] The framers formulated that directive against the background of *Entick v. Carrington*,[52] a case found by the Supreme Court in *Boyd v. United States*[53] to be "sufficiently explanatory of what was meant by unreasonable searches and seizures." *Entick* overturned an executive warrant to search the studies of political dissidents.[54]

As a general proposition, few would question the clarity of the Fourth Amendment right of every citizen to be free from governmental searches and seizures unless sanctioned by judicial warrant based on probable cause. For the purposes of section 241, however, that right may not be clear in an individual case if the circumstances are such that an exception to the warrant requirement may be invoked. Just how clear was Dr. Fielding's right to be free from the search directed by defendant Ehrlichman is the question we examine at this point.

In pre-trial proceedings before the District Court Ehrlichman claimed that the break-in was not in violation of Dr. Fielding's Fourth Amendment rights and developed a contention along the following lines: The entry was undertaken pursuant to an authorized "foreign affairs" or "national security" operation. Since 1940 the "foreign affairs" exception to the prohibition against wiretapping has been espoused by the Executive Branch as a necessary concomitant to the President's constitutional power over the exercise of this country's foreign affairs, and warrantless electronic surveillance has been upheld by lower federal courts on a number of occasions.[55] No court has ruled that the President does not have this prerogative in a case involving foreign agents or collaborators with a foreign power.[56] The Supreme Court, in a number of decisions requiring officials to obtain a warrant before engaging in electronic surveillance, has been careful to note that its rulings do not reach such cases.[57]

Hoping to fall within this as yet not fully defined exception, Ehrlichman urges that in September 1971 "in a matter affecting national security and foreign intelligence gathering" the absence of a judicially approved warrant did not render unlawful "a

---

**50.** *See* citation of *Leach v. Three of the Kings Messengers*, 19 How.St.Tr. 1001, 1027 (1765), in *United States v. U. S. District Court*, 407 U.S. at 316, 92 S.Ct. at 2136.

**51.** 407 U.S. 297, 316, 92 S.Ct. 2125, 2136 (1972).

**52.** 95 Eng.Rep. 807 (1765).

**53.** 116 U.S. 616 at 627, 6 S.Ct. 524 at 530, 29 L.Ed. 746 (1886).

**54.** *Entick*, along with *Wilkes v. Wood*, 19 How. St.Tr. 1153, 98 Engl.Rep. 489 (1763), was also cited in *Coolidge v. New Hampshire*, 403 U.S. at 455, 91 S.Ct. at 2032, as an example of "legal and constitutional means" securing "a right of personal security against arbitrary intrusions by official power."

**55.** Memorandum from President Roosevelt to Attorney General Jackson, May 21, 1940, reproduced in *United States v. Barker*, 168 U.S. App.D.C. 312, 514 F.2d 208, 246–48 (MacKinnon, J., dissenting) (1975) (subsequent authorizations of President Truman and Johnson also

reproduced); *United States v. Butenko*, 494 F.2d 593 (3d Cir. 1974); *United States v. Brown*, 484 F.2d 418 (5th Cir. 1973). On 24 June 1975 Attorney General Levi reasserted this steadfastly maintained position of the Executive Branch in a letter to Senator Edward Kennedy. Petition for Rehearing in *Zweibon v. Mitchell*, No. 73–1847, Appendix I.

**56.** For the first time, this court in *Zweibon v. Mitchell*, 170 U.S.App.D.C. 1, 516 F.2d 594 (1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (April 19, 1976) recently held that the scope of the foreign affairs exemption did not extend to "foreign affairs" cases where the targets of a surveillance were not in collaboration with a foreign power.

**57.** *United States v. United States District Court*, 407 U.S. 297, 321–22, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Giordano v. United States*, 394 U.S. 310, 313–14, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (concurring opinion of Stewart, J.); *Katz v. United States*, 389 U.S. 347, 358 n.23, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

search and seizure authorized by a presidential delegate pursuant to a broad Presidential mandate of power given to that delegate." [58]

Ehrlichman further argues that no specific authorization by the President or the Attorney General was required:

> Implicitly, an instruction to accomplish an end carries with it the duty of performing all lawful acts necessary to accomplish that end. In the instant case, the President delegated the power, to sworn officials of the Executive Branch, including Appellant Ehrlichman, to prevent and halt leaks of vital security information. To contend that the President must specifically chart out the methods of employing the power, each and every time he delegates power is absurd.[59]

The District Court ruled as a matter of law that the national security exemption did not excuse the failure to obtain a judicial warrant for a physical search of Dr. Fielding's office [60] either because there is no exemption for physical searches [61] or because the exemption can only be invoked by the President or the Attorney General in a particular case.[62] This holding, which governed pre-trial discovery instructions to the jury, blocked any evidentiary inquiry into the factual basis for Ehrlichman's alleged belief that the Fielding "covert operation" could yield significant foreign intelligence information. For purposes of this appeal, we accept as possible of proof that probable cause existed for the operation, so that if application for a warrant had been made it would have been granted.

■■ The District Court's ruling was based on two premises. The first is that the "national security" exemption has been "carefully limited to the issue of wiretapping, a relatively nonintrusive search." [63] The circuit court decisions setting forth such an exemption for "the special problem of national security wiretaps" [64] do not go so far as to dispense with the need for a warrant as a requirement for "physical entry of the home . . . the chief evil against which the wording of the Fourth Amendment is directed." [65] We need not in this opinion decide this matter one way or the other, and no inference should be drawn from our failure to discuss it. It suffices to dispose of the case at bar that we find that the District Court was unquestionably correct in its second ground for rejecting Ehrlichman's claim, in its ruling that in any event the "national security" exemption can only be invoked if there has been a specific authorization by the President, or by the Attorney General as his chief legal advisor, for the particular case.

Neither Ehrlichman nor any of his codefendants have alleged that the Attorney General gave his approval to the Fielding operation; and none has attempted to refute former President Nixon's assertion that he had no prior knowledge of the break-in and, therefore, could not and did not authorize the search.[66] Ehrlichman

---

58. Ehrlichman Br. at 14.

59. Ehrlichman Reply Br. at 4.

60. 376 F.Supp. 29 (1974).

61. *Id.* at 33–34.

62. *Id.* at 34–35.

63. *Id.* at 33.

64. *Id.* The District Court cited *United States v. Butenko,* 494 F.2d 593 (3rd Cir. 1974); *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973); *Zweibon v. Mitchell,* 363 F.Supp. 936 (D.D.C. 1973), *rev'd,* 170 U.S.App.D.C. 1, 516 F.2d 594 (1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (April 19, 1976).

65. *Id.* at n.3, quoting *United States v. United States District Court,* 407 U.S. at 313, 92 S.Ct. 2125. The position of the Attorney General of the United States with regard to auditory and visual searches is discussed by Judge Leventhal in his concurring opinion herein and by Judge Wilkey in his opinion in the case of Barker and Martinez.

66. Indeed, for Ehrlichman to argue that the President gave his express authorization to a surreptitious entry and search of Dr. Fielding's office would have been patently inconsistent with Ehrlichman's primary defense at trial. Such authorization would have been transmitted to the "Room 16" unit through Ehrlichman, and he claimed not to have known the unit planned a surreptitious entry and search. The trial judge, however, put the question of Ehr-

soars into a novel claim of authority. No court has ever in any way indicated, nor has any Presidential administration or Attorney General claimed, that any executive officer acting under an inexplicit Presidential mandate may authorize warrantless searches of foreign agents or collaborators,[67] much less the warrantless search of the offices of an American citizen not himself suspected of collaboration.

The defendant totally misapprehends the critical role played by the President and the Attorney General, when the "national security" exception is invoked. It is argued that this exception gives government officials the power surreptitiously to intrude on the privacy of citizens without the necessity of first justifying their action before an independent and detached member of the judiciary. Unless carefully circumscribed, such a power is easily subject to abuse. The danger of leaving delicate decisions of propriety and probable cause to those actually assigned to ferret out "national security" information is patent, and is indeed illustrated by the intrusion undertaken in this case, without any more specific Presidential direction than that ascribed to Henry II vexed with Becket.[68] As a constitutional matter, if Presidential approval is to replace judicial approval for foreign intelligence gathering, the personal authorization of the President—or his alter ego for these matters, the Attorney General—is necessary to fix accountability and centralize responsibility for insuring the least intrusive surveillance necessary and preventing zealous officials from misusing the President's prerogative.

Mr. Justice White, concurring separately in *Katz v. United States*,[69] noted the possibility of recognizing a "national security" exception to the warrant requirement for electronic surveillance, but only if "the President of the United States or his chief legal officer, the Attorney General, has considered the requirements of national security and authorized electronic surveillance as reasonable."[70] As of this writing, that is the only statement by any Supreme Court Justice declaring a national security exemption. Mr. Justice Stewart, concurring in *Giordano v. United States,* noted that "[w]hile two members of the Court have indicated disagreement with that view, the issue remains open."[71] Moreover, the Government in its brief before the Supreme Court in *United States v. United States District Court (Keith),*[72] stated flatly, "We urge the Court to adopt the principle that Mr. Justice White suggested in his concurring opinion in *Katz.*"[73] The Government's argument was based in substantial part on the protection and consistency that would derive from a procedure centered on the Attorney General himself. The Court in *Keith* noted that ". . . the President—through the Attorney General—may find it necessary to employ electronic surveillance to obtain intelligence information on the plans of those who plot unlawful acts

---

lichman's prior knowledge of the break-in squarely to the jury (Tr. 2531), and they found him guilty as charged.

**67.** *Cf. United States v. Coplon,* 185 F.2d 629, 635 (2d Cir. 1950) (warrantless arrest of Justice Department employee apparently engaged in passing defense information to a Soviet agent held inconsistent with statutory requirements; no consideration was given any national security justification for such an arrest); *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); (valid search incident to a deportation arrest upheld which produced evidence of espionage activities; the Court nevertheless noted that "the preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of

the Constitution and laws of the United States.") at 226, 80 S.Ct. at 690.

**68.** Attributed as "Who will free me from this turbulent priest?"

**69.** 389 U.S. 347, 362, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**70.** *Id.* at 364, 88 S.Ct. at 518.

**71.** 394 U.S. 310, 315, 89 S.Ct. 1163, 1166, 22 L.Ed.2d 297 (1969).

**72.** 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

**73.** Gov't Br. at 11.

against the Government." [74] Yet even this expression was in the context of an opinion that held the Constitution required a judicial warrant as a condition for conducting domestic security surveillance,[75] and disclaimed expression of any ruling on the requirement applicable in the case of activities of foreign powers or their agents.[76]

As a historical matter, Presidential memoranda from 1940 to 1965 setting forth Executive policies regarding national security electronic surveillance have stressed the requirement of personal approval by the President or the Attorney General,[77] even though at the time the Supreme Court had held that the Constitution did not require a warrant for such surveillance. No court, Justice of the Supreme Court, or Presidential administration has ever suggested a power which could be generally delegated, for example, even to regular intelligence agencies, like the FBI and CIA, let alone to the extrastatutory group involved in the instant case. Even though the employees and administrators of the regular agencies might have the background, training, and departmental discipline to make responsible, expert decisions, the risk of their myopic abuse of such a powerful prerogative is simply too great to permit its delegation. That risk is substantially magnified when the decision-making group, as here, is an amorphous, *ad hoc* unit with no tradition of public service and no clear lines of responsibility.

Skepticism of power to delegate "authority at will" to make crucial decisions in the Fourth Amendment area led the Supreme Court to hold invalid a delegation within the Department of Justice of the statutory power to authorize even the *application* for a wiretap warrant to be issued by a magistrate once a probable cause determination is made. The Court insisted that "[t]he mature judgment of a particular, responsible Department of Justice official [be] interposed as a critical precondition to any judicial order." [78] *A fortiori,* when what is involved is a claim that an exception permits a Chief Executive determination to replace the neutral magistrate altogether, that determination cannot be delegated. Talismanic invocation of "national security" is not a basis for delegation, it is at most a basis for the claim that there may be a "Chief Executive warrant."

Although Ehrlichman's counsel speak broadly of Presidential authorization, all that they show is that the President authorized the formation of a unit within the White House to stop security leaks and investigate the Ellsberg matter.[79] At no point did the President even mention the possibility of surreptitious wiretaps or other "national security" searches—let alone give any specific authorization for such activity. The law is plain that the simple fact that the President asks a subordinate official to investigate and report on a problem involving national security does not give the official plenary power to exercise all prerogatives the President might have in that area.

Ehrlichman can hardly mean that the President intended to give him all the power that he, the President, had. Obviously, the most that could be argued was the authority to perform "lawful acts necessary to accomplish that end." [80] Whatever the rule for the President, the delegate may not claim, as lawful acts, those which could not be lawfully delegated to his discretion.

As a constitutional matter, if and to the extent that Presidential approval may replace judicial approval for foreign intelligence gathering, the personal authorization of the President—or his Cabinet alter

---

**74.** 407 U.S. at 310, 92 S.Ct. at 2133.

**75.** 407 U.S. at 314–15, 92 S.Ct. 2125.

**76.** *Id.* at 321–22, 92 S.Ct. 2125.

**77.** *See, e. g.,* Appendix to dissenting opinion of Judge MacKinnon, *United States v. Barker,* 168 U.S.App.D.C. 312, 350–52, 514 F.2d 208, 246–48 (1975).

**78.** *United States v. Giordano,* 416 U.S. 505, 515–16, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974), construing 18 U.S.C. § 2516(1) (1970).

**79.** 9 Weekly Compilation of Presidential Documents, No. 21, at pp. 695–96 (22 May 1973).

**80.** Ehrlichman Reply Br. at 4.

ego for these matters, the Attorney General—is necessary to fix accountability and centralize responsibility for insuring the least intrusive surveillance necessary and preventing zealous officials from misusing the Presidential prerogative.

■ Under the circumstances of this case, the law is clear that Dr. Fielding's Fourth Amendment rights were breached when the defendants broke into and searched his office without the requisite judicial authorization. For the purposes of the element of "specific intent" in section 241, it remains only to determine whether the defendants acted with the necessary purpose of trenching upon constitutionally protected interests.

2. *The Requirements of a Purpose to Invade Constitutionally Protected Interests.*

■ As we observed above in connection with our discussion of *Screws* and its progeny, "specific intent" under section 241 does not require an actual awareness on the part of the conspirators that they are violating constitutional rights. It is enough that they engage in activity which interferes with rights which as a matter of law are clearly and specifically protected by the Constitution. As we have already pointed out, in this case the law clearly establishes a violation of Dr. Fielding's Fourth Amendment right to be secure against the warrantless entry and search, the exceptions for entry without a judicial warrant being plainly inapplicable.

■ It is not a violation of section 241 for individuals who happen to be government agents to burglarize a doctor's office for purely personal gain. It *is* a civil rights conspiracy in violation of that section, however, if they enter his office in their capacity as government agents without proper authorization to secure information for an ostensible government purpose. The con-

cern of Congress in enacting section 241 was to extend the federal police power to those who intentionally interfere with federally protected interests—*e. g.*, officials whose specific purpose is to accomplish the governmental objectives of punishment or obtaining confessions or searching private premises, individuals who act with the particular intent of preventing other citizens' equal use of the polls or the interstate highways. The objective must be governmental even though section 241, unlike section 242, does not require that conspirators act under color of law. The states can deal with those who kill or mug or burglarize out of passion or greed for purely personal reasons.

The District Court instructed the jury as follows:

To establish a violation of count one of the indictment, the conspiracy count, the prosecutor must prove beyond a reasonable doubt, first, that a conspiracy existed between one or more defendants or unindicted co-conspirators named in the indictment.

Second, that the purpose of the conspiracy was to carry out a warrantless entry and search of Dr. Fielding's office without his permission.

Third, that the conspirators were governmental employees or agents who intended to enter and to search Dr. Fielding's office without a warrant or permission for governmental rather than purely personal reasons.

Fourth, that Dr. Fielding himself was at the time an American citizen.[81]

These instructions state the law exactly as we have outlined it, and Ehrlichman does not contest that if those instructions were legally correct there was substantial evidence to sustain his conviction under section 241.[82]

Thus, we conclude that Ehrlichman's conviction of conspiracy as set forth in Count I

---

**81.** Tr. at 2524–25.

**82.** Ehrlichman's co-defendants, Barker and Martinez, argue—citing *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966)—that the trial judge erred in failing to

instruct the jury that a conviction under section 241 is only possible if the violation of federal rights is the predominant purpose of the conspiracy. I discuss this argument in Part III of my opinion in *United States v. Barker and*

of the indictment was in full compliance with the *mens rea* requirements of section 241. We turn now to a brief discussion of the defendant's remaining contentions on appeal.

## III. SUBSIDIARY ISSUES

### A. *Severance*

■ The District Court's refusal to grant Ehrlichman's request for a severance can constitute grounds for reversal only if the defendant sustains the burden of showing a clear abuse of discretion by the court.[83] Ehrlichman relies primarily on an alleged inconsistency between his defense and that of his co-defendants, but it appears axiomatic that "the mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trials."[84] To obtain a severance on the ground of conflicting defenses, "[a]t the very least, it must be demonstrated that a conflict is so prejudicial that differences are irreconcilable, and that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' "[85]

■ No such irreconcilable inconsistency of defenses is shown here. Ehrlichman asserts that Liddy, Barker, and Martinez ef-

fectively contended that he had approved the break-in; and as their "superior" he, not they, should be held responsible for the break-in. At no point, however, did Liddy assert that he had acted under Ehrlichman's orders, nor did he argue that Ehrlichman had approved the Fielding entry and search. Rather, his defense was based upon the belief that a warrant had been obtained.[86] Liddy's references to Ehrlichman's position as "nominal supervisor" of the "Room 16" unit,[87] his place in the White House chain of command,[88] and his familiarity with the President's instructions to the unit [89] do not—contrary to Ehrlichman's contention [90] —constitute a charge that Ehrlichman specifically approved a surreptitious entry. There would have been no logical inconsistency in the jury's acceptance of the defenses presented by both defendants.

Even less tenable is the argument that the defense of Barker and Martinez trenched upon that of Ehrlichman. They made no reference whatever to Ehrlichman in presenting their claim of good faith belief in apparent authority. Their defense was based on the circumstances of their relationship with Hunt. It was totally irrelevant to Barker's and Martinez's position whether Ehrlichman had or had not approved the break-in, for they made no claim of such specific knowledge.

Martinez, Nos. 74–1883 & 74–1884, 178 U.S. App.D.C. ——, 546 F.2d 940 and reject it under the recent authority of *Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).

83. *See, e. g., Opper v. United States* 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Isaacs,* 493 F.2d 1124, 1159 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. Gambrill,* 146 U.S.App.D.C. 72, 83, 449 F.2d 1148, 1159 (1971); *Brown v. United States,* 126 U.S.App.D.C. 134, 139, 375 F.2d 310, 315 (1966), *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967).

84. *United States v. Barber,* 442 F.2d 517, 530 (3rd Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). *See also Allen v. United States,* 91 U.S.App.D.C. 197, 202, 202 F.2d 329, 334, *cert. denied,* 344 U.S. 869, 73 S.Ct. 112, 97 L.Ed. 674 (1952).

85. *United States v. Robinson,* 139 U.S.App.D.C. 286, 289, 432 F.2d 1348, 1351 (1970). *See also United States v. Wilson,* 140 U.S.App.D.C. 220, 226–28, 434 F.2d 494, 500–02 (1970); *Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966).

86. Tr. 2432, 2440–2444. The trial judge instructed the jury that if they believed Liddy's contention, it would constitute a mistake of fact which would absolve Liddy of the mens rea required for conviction under section 241. Tr. 2525. The jury's guilty verdict reflects a necessary finding that Liddy entertained no such belief.

87. Tr. 598.

88. Tr. 2432B.

89. Tr. 2438.

90. Ehrlichman Br. at 52–53.

Ehrlichman also relies on the "*De Luna* doctrine"[91] to support his request for severance. He claims that the District Court's refusal to sever, which precluded any comment by him on Liddy's failure to take the stand, unduly prejudiced his defense. It would appear clear, however, that severance is not required simply because one defendant may wish to comment on another's refusal to testify.[92] In *De Luna*, two defendants, tried jointly on narcotics charges, each claimed the other was solely responsible. In the presence of mutually exclusive and irreconcilable defenses, the importance to one defendant of the ability to comment on the silence of his co-defendant was overwhelming. No such inconsistent defenses are present here, and Liddy was the only one of seven of Ehrlichman's alleged co-conspirators who failed to take the stand. Under these circumstances, we do not find that the District Court abused its discretion in refusing to sever Ehrlichman's trial from that of his co-defendants.[93]

### B. *Ehrlichman's Discovery Rights*

Ehrlichman claims he was improperly denied his rights under Rule 16 of the Federal Rules of Criminal Procedure to the production of all evidence material to the preparation of his defense and, under *Brady v. Maryland*,[94] to all evidence "favorable to an accused." The Special Prosecutor asserts that he voluntarily produced all documents in his possession which were even remotely relevant to the issues to be tried. Further, he contacted all governmental departments, including the White House, which might be expected to have material possibly exculpatory of Ehrlichman or his co-defendants. These departments reported the results of their searches in affidavits. On appeal Ehrlichman apparently does not question the accuracy of these affidavits or their fulfillment of the prosecution's obligation to disclose relevant information to the defense,[95] with the exception of the affidavit filed by J. Fred Buzhardt on behalf of the White House. As to the Buzhardt affidavit, however, Ehrlichman failed to present any evidence before the District Court to support his argument here that Buzhardt's review generally was inadequate or his representations inaccurate.[96] Nor has he presented any such evidence to us. Ehrlichman's broad challenge to the

91. *De Luna v. United States*, 308 F.2d 140 (5th Cir. 1962).

92. *See United States v. Barber*, 442 F.2d 517, 529–30 (3rd Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). Comment is all of which Ehrlichman could have been deprived. Even if separate trials had been granted, Liddy still could not have been compelled to testify.

93. *See United States v. Hines*, 147 U.S.App. D.C. 249, 266, 455 F.2d 1317, 1334, *cert. denied*, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972). *See also United States v. Roselli*, 432 F.2d 879, 902 (9th Cir. 1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).

94. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

95. Although Ehrlichman's brief discourses at some length about the requirement under *Brady* that the prosecution turn over all relevant information, with the exception of the "Leaks" file (which we discuss below) he specifies on appeal no relevant material which was not handed over. In the absence of such specification, the government can do no more than examine possibly relevant files and make a good faith representation that relevant material does or does not exist. Certainly, there is no requirement of wholesale disclosure of all files which could conceivably contain relevant items. This applied here to White House files as well as files in the hands of the Special Prosecutor.

96. Ehrlichman contends that he was improperly denied the opportunity to take the stand at a pre-trial hearing on the satisfaction of *Brady* requirements in order to establish the materiality and relevancy to his case of certain White House documents not turned over to him by Mr. Buzhardt. Our review of the transcript of that hearing reveals this contention to be groundless. Though repeatedly requested by the trial judge to specify just what documents Ehrlichman would discuss and why they might be relevant, counsel for the defendant was unable to give a single concrete example of how Ehrlichman's testimony would be helpful. The trial judge nevertheless offered to consider any motion or subpoena which might be drawn under Rule 16 or Rule 17 directed to any particular documents, describing their relevance and the reasonableness of their production. *See* text accompanying note 98 *infra*.

validity of Buzhardt's inspection of White House files for materials relevant to Ehrlichman's defense must fail.

We are left with the arguments made by Ehrlichman with respect to specific materials held by the White House which he desired produced.[97] The first of these were Ehrlichman's notes recording private Presidential conversations and meetings. As part of his overall review referred to above, Buzhardt examined those notes, found none bearing on the guilt or innocence of Ehrlichman or his co-defendants, but turned over Xerox copies of those that seemed conceivably relevant. Moreover, Ehrlichman was given personal access to *all* the notes. In response to the trial judge's repeated request that Ehrlichman specify which notes of individual conversations he considered had been improperly withheld, Ehrlichman on 21 June 1974 filed a motion for the issuance of a subpoena *duces tecum* for the notes of ten different conversations. An accompanying memorandum detailed Ehrlichman's reasons for considering those particular notes material to his defense. In response to that motion the White House turned over the requested notes to the trial judge for *in camera* inspection. Also, on 24 June the Special Prosecutor filed a lengthy memorandum arguing the irrelevancy of each of the conversations sought to the issues at trial.[98] With the actual notes before him, Judge Gesell found the Special Prosecutor's position persuasive and quashed the subpoena. We have reviewed these notes as well and find ourselves in complete accord with the trial judge's determination. With the exception of the "Leaks" file, discussed below, Ehrlichman identifies on appeal no other specific documents or notes which were wrongfully denied him.

Nevertheless, Ehrlichman argues, first, that the District Court should have ordered the White House to submit to it all his notes of Presidential conversations and, apparently, all other White House material Ehrlichman requested for *in camera* inspection to determine their relevance. Even were this a case not involving "presumptively privileged Presidential files,[99] Ehrlichman's failure to argue with specificity the materiality and reasonableness of his discovery request would render his position

**97.** Ehrlichman on appeal raises an argument, relying primarily on the Jencks Act, 18 U.S.C. § 3500 (1970), that he was improperly denied transcripts of testimony taken in executive session by the Subcommittee on Intelligence of the House Armed Services Committee. Ehrlichman, however, was specifically directed by the District Court to file written papers on this issue if he wished to join the motions of his co-defendant, G. Gordon Liddy, for the production of that testimony. Tr. 1972. He failed to file any papers, and so has waived his right to press this point on appeal. In any event, in our companion opinion in *United States v. Liddy*, 177 U.S.App.D.C. ——, 542 F.2d 76, Judge Merhige's considered rejection of the contention that the District Court's failure to procure these transcripts was reversible error is equally applicable here.

**98.** The Special Prosecutor observed, first, that many of the enumerated notes—all but three of which recorded conversations which took place after the break-in occurred—were sought by Ehrlichman in order to disprove the allegation that he had attempted to conceal the break-in. The Prosecutor pointed out, however, that he had decided to drop concealment as part of the conspiracy charge. This rendered irrelevant those notes sought in order to disprove concealment.

Second, Ehrlichman claimed some of the notes would help show he did not have the requisite intent to violate Dr. Fielding's constitutional rights—that his motives were the laudatory ones of stopping security leaks and gathering information for legislative action. As the Special Prosecutor pointed out, however, good motives do not negative intent under section 241. Even assuming, *arguendo*, that his purpose was laudatory, to achieve it by unlawful means was still unlawful.

Finally, Ehrlichman argued some notes would show the President intended the "Room 16" unit to assume the functions of the F.B.I. and to act lawfully, rather than unlawfully. The Special Prosecutor observed that this fact was undisputed. The real question was whether the President had specifically authorized the unit to undertake the Fielding break-in; and Ehrlichman, with full access to his notes, made no allegation that such authorization had been given.

**99.** *See United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Nixon v. Sirica*, 159 U.S.App.D.C. 58, 75, 487 F.2d 700, 717 (1973).

untenable.[100]  In the face of the requirement for a "demonstrated specific need" for the evidence or a showing "that the Presidential material was 'essential to the justice of the [pending criminal] case,' "[101] we must reject his position.

■ Second, Ehrlichman contends he was deprived of his Sixth Amendment right to counsel when the President permitted Ehrlichman, but not his attorney, to examine his notes.  The fact that Ehrlichman was given access to these files—which recorded Presidential conversations apparently unrelated to the Fielding break-in—could not vest a right of access in his attorney, who was not privy to the conversations.  The order did not prevent Ehrlichman from leaving the room where the files were located at any time to inform his attorney in detail of the materials he had located.  Ehrlichman does not contend that his attorney would have been prevented from framing subpoenas *duces tecum* for relevant material so located.  In sum, the District Court committed no error with respect to its handling of the discovery of Ehrlichman's notes.

■ The only evidence Ehrlichman specifically alleges to be exculpatory and wrongfully withheld is the so-called "Leaks" file.  On 26 March 1973, a briefcase filled with files on the "Pentagon Papers" investigation, which had been in the possession of David Young, was delivered to Ehrlichman's office.  Before that delivery, Young photocopied those documents which implicated Ehrlichman in the Fielding break-in.  Young testified at trial that Ehrlichman later told him he had removed certain of the documents which were most incriminating before returning the files to Young, and that Young verified this fact when reviewing the files.  Ehrlichman tes-

tified that he had not removed those memoranda.  Eventually, the documents wound up in a file marked "Leaks," in a box marked "Ehrlichman," in the White House.

Ehrlichman contended at trial that production of the file was necessary to show he was involved in legitimate efforts to tighten security and prevent leaks within the government.  The President's attorney, James St. Clair, indicated in a hearing on the matter that the file contained numerous classified documents not relating to Dr. Fielding or David Ellsberg.  He indicated, however, that he thought the President would permit disclosure of specific documents from the file if such a request were made.  Ehrlichman never submitted such a request nor showed why production of the entire file was necessary to his defense.

On appeal, however, for the first time Ehrlichman argues that production of the file *folder* was important to show that the designation "Leaks" on the folder was not in his handwriting and the file had been created by someone else.[102]  Not only is this theory produced at much too late a date, but it is extremely doubtful that such evidence could have influenced the jury's verdict.  We find therefore, that Ehrlichman has not show sufficient actual prejudice to his case to justify reversal of his conviction for the District Court's refusal to order the production of the "Leaks" file.

## C.  *The Sufficiency of the District Court's Interrogatories to the President*

■ Ehrlichman's final argument is that the District Court erred in failing either to require then-President Nixon to appear as a witness at trial or answer detailed interrogatories propounded by the defendant.  First, it would appear that if a subpoena *duces tecum* on a President may only

---

**100.**  See note 95 *supra.*

**101.**  *United States v. Nixon*, 418 U.S. at 713, 94 S.Ct. at 3110, quoting *United States v. Burr*, 29 Fed.Cas. No. 14,694, pp. 187, 190 (Va.1807).

**102.**  He also argues that production of the original memoranda Young alleged Ehrlichman removed from Young's files would show that

they had not been destroyed.  The government itself at trial, however, produced evidence showing the incriminating documents were not destroyed but placed in files Ehrlichman maintained and controlled.  The government's own case, then, confirmed the position Ehrlichman now alleges he needed the "Leaks" file to prove.

be enforced where there is a "demonstrated specific need" for the testimony or the testimony is "essential to the justice of the [pending criminal] case," [103] certainly a more burdensome subpoena *ad testificandum* would have to meet at least equal standards. Neither Ehrlichman nor any of his co-defendants, however, claims that the President specifically authorized the break-in. The Special Prosecutor disclaimed any evidence indicating Presidential authorization and the President himself denied even having had prior knowledge of the Fielding operation. In the absence of claim of direct Presidential involvement, and in view of the substitute procedure available to the defendant of propounding interrogatories, we find unpersuasive Ehrlichman's argument that President Nixon should have been compelled to appear as a witness.

■ Second, as to the detailed interrogatories submitted by Ehrlichman, we find, as did the District Court, that many of the questions were repetitive or irrelevant to the issues properly before the court. The court drafted concise questions addressed to the central issues of the Ehrlichman submission and the President answered these. Ehrlichman contends, however, that the court's interrogatories were inadequate to explore the issue whether concealment of the activities of the "Room 16" unit was undertaken pursuant to Presidential order, to protect highly classified information, or whether such concealment was intended instead to mask wrongdoing. Our comparison of the interrogatories submitted by the defendant and those formulated by the court on this issue lead us to reject this contention. It appears highly unlikely that the President's answers would have dif-

fered in any significant respect had Ehrlichman's submission been adopted. Moreover, the President's response to the court's interrogatories revealed that he would have had little useful testimony to give on the question of concealment—even assuming the relevance of that question to the issues at trial [104]—if he had been called to testify in person.[105]

### Conclusion

For the foregoing reasons, the District Court judgment is

*Affirmed.*

LEVENTHAL, Circuit Judge, joined by MERHIGE, District Judge, concurring:

This supplemental concurring opinion is not meant to derogate from Judge Wilkey's opinion for the court, in which I join, but is occasioned by the amicus curiae memorandum submitted by the Department of Justice. Because it is not necessary to pass on the contention tendered therein, the court's opinion prudentially avoids discussion of it. But an entirely proper and useful function of a concurring opinion is to identify matters that did not call for dispositive ruling. And since the Department's amicus memorandum seems to me to cut across the very protection the Fourth Amendment was designed most fundamentally to provide, I view my responsibility as a judge as calling on me to voice my concern.

### Brief of Special Prosecutor

When I read the Brief for the United States filed on May 2, 1975, signed by Special Prosecutor Henry S. Ruth, Jr. and other members of the Watergate Special Prosecution Force, I was completely convinced—un-

---

**103.** *United States v. Nixon,* 418 U.S. at 683, 94 S.Ct. at 3090.

**104.** See note 98, *supra.*

**105.** President Nixon stated in response to court interrogatories number three and four:

I do not have a precise recollection of instructions given to Mr. Ehrlichman with respect to any specific agencies. In substance, however, I do recall repeatedly emphasizing to Mr. Ehrlichman that this was a highly

classified matter which could be discussed with others only on an absolutely "need to know" basis. I conveyed these instructions because I believed that the Unit could not function effectively if its existence or the nature and details of its work were compromised by disclosure. These instructions were given at various times after the Special Investigations Unit was formed, which was shortly after June 13, 1971.

Tr. 2305.

less appellant's oral argument provided insights not foreshadowed in his brief—that it demolished appellant's contention that the break-in of Dr. Fielding's office was consistent with the Fourth Amendment. I was satisfied that it was entirely sound in its doctrine that a physical break-in to a home or office without a judicial warrant contravenes the Fourth Amendment, where as here the dark-of-night entry and search, planned weeks in advance, did not present "exigent circumstances" or any other of the "few specifically established and well-delineated exceptions" to the warrant requirement. See *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).[1]

In the Brief for the United States the Special Prosecutor relies on "200 years of precedent interpreting and shaping the Fourth Amendment" as establishing that a warrant must be obtained in all cases for the physical search of a citizen's home or office, citing such cases as *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)[2] (warrantless and unconsented entry into a doctor's offices for the purpose of rummaging through his files), *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). He sees no reason to depart from that rule on national security grounds. Indeed the cases motivating adoption of the Fourth Amendment struck down governmental claims of unregulated power to search for evidence of treason and sedition.[3] No American case since has sustained the right to search a home or office without a warrant merely in the name of national security. Although the precise issue at stake here has not previously been raised, those cases dealing with espionage prosecutions, where the national security implications were evident, refused to tolerate any deviation from standard Fourth Amendment requirements.[4] In expanding the basic protections of the Fourth Amend-

1. This was obviously not a search incident to arrest, nor a seizure of evidence in "plain view" of the police. The exception for exigent circumstances is developed in such cases as *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Dorman v. United States*, 140 U.S.App. D.C. 313, 435 F.2d 385 (en banc, 1970).

2. Overruled on other grounds in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

3. The Framers formulated the Fourth Amendment against the background of *Entick v. Carrington*, 95 Eng.Rep. 807 (1765), a case found by the Supreme Court in *Boyd v. United States*, 116 U.S. 616, 627, 6 S.Ct. 524, 530, 20 L.Ed. 746 (1886) to be "sufficiently explanatory of what was meant by unreasonable searches and seizures." *Entick* upheld damages against the Secretary of State, who issued a general executive warrant to seize papers in a case of seditious libel. In a 1761 debate that helped inaugurate opposition to Great Britain, James Otis denounced the similar practice of using writs of assistance to empower revenue officers to search on their discretion for smuggled goods as "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book" since they placed the "liberty of every man in the hands of every petty officer." Quoted in *Boyd v. United States*, 119 U.S. at 625, 6 S.Ct. at 529.

Undertaking a search without a warrant on the "belief, however well founded, that an article sought is concealed in a dwelling house," *Agnello v. United States*, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925) has consistently and repeatedly been condemned as inconsistent with the Fourth Amendment's requirements. See, e. g., *Coolidge v. New Hampshire*, 403 U.S. 443, 477–78, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

4. See, *United States v. Coplon*, 185 F.2d 629, 635 (2d Cir. 1950) (warrantless arrest of Justice Department employee apparently engaged in passing defense information to a Soviet agent held inconsistent with statutory requirements; no consideration was given any national security justification for such an arrest; *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (valid search incident to a deportation arrest upheld which produced evidence of espionage activities; the Court nevertheless noted that "the preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States.") at 226, 80 S.Ct. at 690.

ment, the wiretap cases have not simultaneously eroded the Fourth Amendment's general protections already clearly in existence.

*Amicus Curiae Memorandum*

On May 30, 1975, a few weeks before the date set for oral argument, there was filed in this court a two-page Memorandum for the United States as Amicus Curiae, signed by John C. Kenney, Acting Assistant Attorney General. It set forth that it was submitted pursuant to Rule 29, Fed.Rules of Appellate Procedure and "states the views of the United States" concerning the issue of the legality of forms of surveillance in the United States in cases involving foreign espionage or intelligence. The view thus set forth is this, that a warrantless search is lawful under the Fourth Amendment provided there is "solid reason to believe that foreign espionage or intelligence is involved," intrusion into any zone of expected privacy is "kept to the minimum" and there is "personal authorization by the President or the Attorney General." As to searches governed by such conditions, the Memorandum puts it there is no constitutional difference between searches conducted by wiretapping and those involving physical entries into private premises. The Memorandum concludes its presentation of "the position of the Department of Justice":

It is and has long been the Department's view that warrantless searches involving physical entries into private premises are justified under the proper circumstances when related to foreign espionage or intelligence (see U.S. Brief p. 45, n. 39).

**5.** *See* Hearings before the Select Committee on Presidential Campaign Activities of the United States Senate, 93d Cong., 1st Sess. Book 6 (testimony of July 25, 1973) p. 2601:

Senator Talmadge: Do you remember when we were in law school, we studied a famous principle of law that came from England and also is well known in this country, that no matter how humble a man's cottage is, that even the King of England cannot enter without his consent.

That footnote 39 of the earlier-filed United States Brief, signed by Mr. Ruth, reads as follows:

[39] Attorneys General in certain circumstances have permitted warrantless foreign intelligence surveillance involving a technical trespass solely for the purpose of placing a bug.

*The Resulting Problem*

The facts of this case required a rejection of appellant's contention whether the court accepted the position set forth in the Brief for the United States or the position set forth in the Memorandum for the United States as Amicus Curiae. Because none of the defendants in this action claimed or offered to prove that either the President or the Attorney General specifically authorized the break-in, it was unnecessary for us to decide whether or not a physical break-in and search undertaken for foreign security reasons on the specific authority of the President or Attorney General would meet the requirements of the Fourth Amendment. Without such authorization, no possible claim of the validity of undertaking such a search could be maintained.

What troubles me about the application of conventional judicial approach, calling for decision on narrowest grounds available, is that regardless of what the judges say, their action in failing to reject the contention in the Justice Department Memorandum may be taken to signify that it has substance.

It troubles me particularly because the position is asserted by the Department of Justice, the law department of the Executive Branch, and has reverberations. That kind of assertion of an exception to settled doctrine may lead to an assumption by highly placed officials that the settled doctrine is now "eroded".[5]

Mr. Ehrlichman: I am afraid that has been considerably eroded over the years, has it not?
Senator Talmadge: Down in my country we still think it is a pretty legitimate principle of law.
Senator Talmadge's words recall the historic declamation by William Pitt, first Earl of Chatham, distinguished also for denouncing the American policy of George III, in his address to the House of Lords:

The very assertion of the exception by the Department of Justice accomplishes some diminution of the sense of privacy of all. While the Memorandum posits as a condition that there must be "solid reason" to believe foreign espionage or intelligence is involved, that determination requires judgment and discretion. The *Keith* opinion identifies the problem when there is executive discretion without review—stating that "unreviewed executive discretion may yield too readily to pressures" and "those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks." *United States v. United States District Court,* 407 U.S. 297, 317, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752 (1972). Citizens whose views are in opposition to the Administration's may be pursued on the ground of some relation to foreign intelligence, although that is not in fact the case. Indeed, in this case it was admitted that Dr. Fielding, whose office was broken into, had no relation whatever to foreign intelligence, and although that was speculated as a possibility as to Dr. Ellsberg, no information linking Dr. Ellsberg to foreign intelligence has yet been disclosed.

The problem is deepened by the reality that any executive action on the basis of the asserted exception will be unknown. The mere impairment of a general sense of privacy apparently would not confer standing to challenge unknown actions. *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Yet when executive authority is not only asserted but acted upon, that somehow seems to lead to an argument based on practice. Indeed, the Memorandum Amicus Curiae seeks to build on the fact that in certain instances the Attorney General has authorized a technical trespass to place a bug, as noted in the United States Brief, translating this into a long-settled view that there is authority for "physical entries into private premises"[6] without taking any note of the position of the United States Brief, that technical trespasses to conduct electronic surveillance stand in a different position from entries to conduct physical seizures or visual searches of papers, and that the two types of intrusion have had distinctively different conceptual approaches and legal histories.[7]

"The poorest man may in his cottage bid defiance to the forces of the Crown. It may be frail—its roof may shake—the wind may blow through it—the storm may enter—the rain may enter—but the King of England cannot enter!—all his force dares not cross the threshold of the ruined tenement!" (Quoted in I. Brougham, Statesmen in the Time of George III. 52 (1839).)

6. The United States Brief notes, however, that the United States did not defend this proposition when presented with the opportunity in *United States v. Butenko,* 494 F.2d 593 (3d Cir.), *cert. denied sub nom. Ivanov v. United States,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974), by failing to resist disclosure of trespassory surveillance logs.

7. In holding the Fourth Amendment applicable only to searches "of material things" (277 U.S. at 464, 48 S.Ct. 564) and not to electronic surveillance, the 1928 Olmstead case emphasized that the wiretaps were made "without trespass upon any property of the defendants." *Olmstead v. United States,* 277 U.S. 438, 457, 48 S.Ct. 564, 565, 72 L.Ed. 944 (1928); *Overld* in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) It had already been established in *Gouled v. United States,* 255 U.S.

298, 41 S.Ct. 261, 65 L.Ed. 647 (1921) (disapproved in part in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) that a search by stealth of a citizen's private quarters is an unreasonable search. In *Silverman v. United States,* 365 U.S. 505, issued March 6, 1961, the Court ruled (at 509–10, 81 S.Ct. 679, at 681–82, 5 L.Ed.2d 734) that "eavesdropping . . . by means of an unauthorized physical penetration into the premises occupied by the petitioners" was "beyond the pale" of prior decisions of a divided Court holding that "eavesdropping accomplished by other electronic means did not amount to an invasion of Fourth Amendment rights."

Although the *Olmstead* decision put warrantless nontrespassory electronic surveillance outside the scope of the Fourth Amendment, the Court's *Nardone* decisions of 1937 and 1939 construed the Federal "wiretap" statute as prohibiting the intercept and disclosure of wiretap-garnered information by Executive officials, even in court, as "inconsistent with ethical standards and destructive of personal liberty." *Nardone v. United States,* 308 U.S. 338, 340, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939); *Nardone v. United States,* 302 U.S. 379, 383, 58 S.Ct. 275, 82 L.Ed. 314 (1937). The Attorney General had

The Amicus brief in effect seeks to rewrite history by saying that the Department of Justice has always sanctioned trespasses, and seeks to finesse the distinction between technical trespass for electronic surveillance and the kind of breaking and entering that was for hundreds of years labelled a core violation of fundamental rights. That the "long-settled" position of the Department marked a crucial distinction between the two trespasses is confirmed by the recent report of a Senate Select Committee which found: "There is no indication that any Attorney General was informed of FBI 'black bag jobs', and a 'Do Not File' procedure was designed to preclude outside discovery of the FBI's use of the technique." [8]

As appears from the history reviewed in the margin (footnote 7), in the days after *Olmstead* (1928) and before *Katz* (1967), there were Presidential directives—in 1940, 1946, and 1965—permitting the Attorney General to secure information by intercept of telephone communications in the interest of national security. While these plainly permitted phone taps implemented off the suspect's premises, they did not specifically authorize physical trespass, and the 1961 *Silverman* opinion held that even though there was no general Fourth Amendment ban on warrantless wiretaps, there was a ban on warrantless electronic eavesdropping gained by "unauthorized physical penetration into the premises."

There may well be a critical difference between electronic surveillance and physical entries for the purpose of search and seizure of papers, and a two-page ipse dixit statement of views in the Memorandum does not suffice to lead me to question the presentation in the United States Brief. While history is not determinative, physical entry into the home was the "chief evil" appreciated by the framers of the Constitution. *United States v. United States Dis-*

construed the statute as permitting intercept in the absence of disclosure.

It was against this background of statutory rather than constitutional prohibition of warrantless surveillance that the national security exception for wiretapping was first invoked. In 1940 President Roosevelt authorized the Attorney General to secure information by listening devices of conversations of persons suspected of subversive activities against the United States Government. That outstanding directive was continued by President Truman in 1946. In 1965 President Johnson issued a directive that the interception of telephone communications "should be engaged in only where national security is at stake;" and approval of the Attorney General is obtained. As Acting Attorney General Ramsey Clark extended that directive to all "listening devices in private areas." The prohibition put on such electronic interceptions thus respected statutory and voluntary limits on surveillance even though the Fourth Amendment under *Olmstead* did not require such restraint. (Cited memoranda collected at 514 F.2d at 246–48).

After the Supreme Court decided *Katz* in 1967, and held the Fourth Amendment applicable to electronic surveillance, Congress passed the *Omnibus Crime Control and Safe Streets Act* of 1968, requiring and providing for judicial authorizations of such surveillance. 18 U.S.C. § 2511(3) provided that nothing in the original wiretap law (§ 605 of the Communications Act of 1934, 47 U.S.C. § 605) or this Act "shall limit the constitutional power of the President . . . to obtain foreign intelligence information

deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities." When *Katz* was decided by the Supreme Court in 1967, one Justice (White) indicated that the Fourth Amendment was not applicable if the President or the Attorney General had determined that electronic surveillance was necessary to protect the security of the Nation. (389 U.S. at 363–64, 88 S.Ct. 507). Two Justices disagreed and denied that this could dispense with a warrant (see Douglas and Brennan, JJ. at pp. 359–60, 88 S.Ct. 507). The other Justices declined to rule on that issue, *see* 389 U.S. 358, footnote 23, 88 S.Ct. 507, and Stewart, J. in *Giordano v. United States,* 394 U.S. 310, at 315, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). Two circuit courts subsequently upheld as valid warrantless electronic surveillance, in instances where the surveillances had been expressly approved by the Attorney General. *United States v. Butenko,* 494 F.2d 593 (3d Cir.) (en banc), *cert. denied, sub nom. Ivanov v. United States,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974), Attorney General approval, set forth in 318 F.Supp. 66, 70–71 (D.C.N.J.1970); *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974).

8. S.Rep.No.94–755, 94th Cong., 2d Sess., Final Report of the Select Committee to Study Governmental Operations with respect to Intelligence Activities, Vol. II (1976), p. 61.

*trict Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). This argues strongly for the proposition that the safeguard against this chief evil is not to be whittled away on abstract grounds of symmetry, merely because the new evil of electronic surveillance was possibly subject to a national security exception when, in 1967, it came to be regulated by constitutional doctrine.

The analysis in *Keith* makes it clear that the importance of the interest protected has bearing on the permissibility of warrantless intrusions.[9] In testimony before the Senate Select Committee to Study Governmental Operations with respect to Intelligence Activities, November 6, 1975, Attorney General Levi has also recognized that "[t]he nature of the search and seizure can be very important. An entry into a house to search its interior may be viewed as more serious than the overhearing of a certain type of conversation. The risk of abuse may loom larger in one case than the other." (p. 32). He also notes that the warrant requirement depends on both "the purpose and degree of intrusion." (p. 46). The Attorney General apparently contends that a high purpose of the intrusion outweighs from a constitutional standpoint the physical act of intrusion itself. Yet the Attorney General recognizes that the nature of the intrusion may outweigh the purpose, and that a judicial warrant is a precondition before there can be an intrusion on a citizen who is not suspected of any foreign link against the United States. This he identifies as being the exact ruling of *Zweibon v. Mitchell,* 170 U.S.App.D.C. 1, 516 F.2d 594 (1975, en banc).

Even if it be assumed that the Supreme Court will take a step so far declared only by Justice White, and hold warrantless electronic surveillance justified in the case of foreign intelligence activities, that step may be responsive to an assertion that practical realities require a continuous and protracted electronic surveillance, of certain foreign representatives or agents, that does not lend itself to the warrant procedure.[10] Any claim of authorization to make physical entries, however, would project a more discrete kind of intrusion, without the same claim to a need for avoiding a warrant procedure. The Attorney General's testimony makes this kind of distinction in the electronic surveillance context, noting that "the more limited in time and target a surveillance is, the more nearly analogous it appears to be with a traditional criminal search which involves a particular target location or individual at a specific time," and thus apparently the more "amenable to some sort of warrant requirement."[11] And Justice Powell's opinion in *Keith* certainly rejects lesser contentions against a judicial warrant, that judicial machinery cannot be trusted with secrets, and with the ability to handle the differences between security issues and the probable cause of past criminality normally considered by judges.

The foreign security rationale of the Justice Department's amicus memorandum would apply even if there were no "exigent circumstances" that would justify use of the emergency exception. That rationale

9. Electronic surveillance in terms of intrusiveness, notice, utility and methodology, differs fundamentally from more traditional searches, and the Supreme Court has dealt separately with the problems it poses. White's opinion in *Katz,* only refers to electronic surveillance as permissible without a warrant under a national security exception. And the Court's consideration in *Keith* of the claim of a domestic security exception focused on the special features of electronic surveillance instead of reasoning from the physical search cases.

10. Attorney General Levi, in his November 6, 1975, testimony before the Senate Select Committee to Study Governmental Operations with

respect to Intelligence Activities, drew a distinction in terms of the significance and value of a judicial warrant among three categories of electronic surveillances undertaken to protect national security: surveillance to protect against specific anticipated criminal offenses of a particular foreign agent; a more extended or continuous surveillance directed at an identified foreign agent to monitor his activities, contacts and to gain knowledge about his county; virtually continuous surveillance without specifically predetermined targets for the gathering of foreign intelligence information.

11. *Id.* at p. 50 (mimeo).

lacks any principle of self-containment. The basic premise of stated Fourth Amendment law—that in the absence of exigent circumstances a physical search is per se unreasonable without a judicial warrant—is thus to be sacrificed on the altar of security, and this in the context of a physical search of a person who was not believed to be a traitor but was merely a repository of information on the personality of a patient, who in turn was deemed involved in our nation's foreign security.[12]

One is hard put to know how to cope with the assertion in the Amicus Curiae Memorandum that it "has long been" the position of the Department of Justice that warrantless physical entries are justified "under the proper circumstances when related to foreign espionage or intelligence." Was this position disclosed? In what respect does a practice that is not disclosed reflect a "position" of legality? It has recently developed that the FBI has in the past *secretly* made physical entries for the purpose of "black bag" jobs. It could fairly be put that the secrecy at the time was a recognition of the *illegality* of the practice.[13] We have no indication that any Attorney General was informed of these (*see* text at note 8, *supra*). We are certainly not told the nature of the "proper circumstances" in which any Attorney General allowed physical entries "when related to foreign espionage or intelligence." Was this after the 1961 *Silverman* case? Was the invasion of premises of foreign governments (where it may be argued the Fourth Amendment offers no protection)? Or of foreign agents of foreign governments?

Justice Powell's concern over unreviewed executive discretion is not squarely met by the Justice Department's position that the search here would stand on different ground if authorized by former Attorney General Mitchell. Justice Powell warned that the availability of a doctrine permitting unreviewed executive discretion to conduct surveillance in the name of security provides temptation to abuse rights, and he cited Chief Justice Warren's caution in *United States v. Robel*, 389 U.S. 258, 264, 88 S.Ct. 419, 424, 19 L.Ed.2d 508 (1967):[14]

> [T]his concept of "national defense" cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term "national defense" is the notion of defending those values and ideals which set this Nation apart . . . It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile.

The long and short of it is that the Amicus Memorandum seeks to use *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which expanded Fourth Amendment protection to the field of electronic surveillance, as a means of contracting Fourth Amendment protection outside the electronic surveillance domain. In *Katz* the Court "refused to lock the Fourth Amendment into instances of actual physical trespass."[15] *Katz* and *Keith* were intended to open, not lock, the protection of the Fourth Amendment.

**12.** *See, e. g., Zweibon v. Mitchell, supra,* 516 F.2d at 652–53.

**13.** The Senate Select Committee similarly explains the practice of secrecy:

> The only internal FBI memorandum found discussing the policy for surreptitious entries confirms that this was the procedure and states that "we do not obtain authorization from outside the Bureau" because the technique was "clearly illegal." The memorandum indicates that "black bag jobs" were used not only "in the espionage field" but also against "subversive elements" not di-

rectly connected to espionage activity. It added that the techniques resulted "on numerous occasions" in obtaining the "highly secret and closely guarded" membership and mailing lists of "subversive" groups.

S.Rep.No.74–755, 94th Cong., 2d Sess., Final Report of the Select Committee to Study Governmental Operations with respect to Intelligence Activities, Vol. II (1976), p. 62.

**14.** *United States v. U. S. District Court, supra,* 407 U.S. at 332, 92 S.Ct. 2125.

**15.** *United States v. U. S. District Court, supra,* 407 U.S. at 313, 92 S.Ct. at 2135.

**940**

Without purporting to provide a binding ruling on the matter—for it affects the liability of neither Ehrlichman nor his codefendants—I thus record this reaction to the legal arguments presented in this case. The federal courts should not tinker with the Supreme Court's presently announced doctrine, requiring a warrant for physical entries except in exigent circumstances, unless and until the Supreme Court says so. Neither the Executive's hitherto undisclosed past conduct nor its present Amicus claim justifies expansion of the exigency exception.