Nathaniel JEFFERS

v.

UNITED STATES of America.

Clinton BUSH

v.

UNITED STATES of America.

Paul James GRIFFIN, Jr.

v.

UNITED STATES of America.

Nos. H 77–393, H 77–423 and H 77–26.

United States District Court,
N. D. Indiana,
South Bend Division.

May 22, 1978.

Nathaniel Jeffers, pro se.

Clinton Bush, pro se.

Paul James Griffin, Jr., pro se.

David T. Ready, U. S. Atty., South Bend, Ind., Richard A. Hanning, Asst. U. S. Atty., Hammond, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

On March 18, 1974, the Petitioners, Nathaniel Jeffers, Clinton Bush and Paul James Griffin, Jr., and twelve other individuals were charged in a one-count indictment in the United States District Court for the Northern District of Indiana under cause number HCR 74–56 with conspiring over a two and one-half year period to distribute heroin and cocaine in violation of Title 21 of the United States Code, Section 846. On June 27, 1974, the Petitioners and four co-defendants were convicted by a jury as charged under the conspiracy indictment. The Petitioners were each sentenced to 15 years imprisonment on August 6, 1974 by this Judge. From the conviction and sentences, the Petitioners filed a direct appeal.

The principal question raised on direct appeal by the attorneys who had acted as trial counsel was whether the failure of the

defense counsel to conduct a thorough cross-examination of a former client, who testified as a prosecution witness, required reversal of that conviction. Specifically, they challenged the refusal of the court to grant a motion to withdraw made by counsel based upon a purported inability to cross-examine James Berry, alleging a conflict of interest resulting from prior representation by an associate attorney in the defense counsel's firm. Additionally, they raised questions of the court's rulings on motions to suppress both physical evidence and statements made by co-defendant, Garland Jeffers.

All convictions were affirmed, *United States v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975), and the United States Supreme Court denied the Petition for Writ of Certiorari, *Jeffers v. United States*, 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1975).

The Petitioners and their co-defendants subsequently filed their first habeas corpus petition on February 9, 1976, which was denied. The Court of Appeals affirmed, *Garland Jeffers et al. v. United States*, United States Court of Appeals for the Seventh Circuit Number 76–1532 (decided November 24, 1976) (unpublished order). A petition for Writ of Certiorari was denied from that decision by the United States Supreme Court, *Jeffers et al. v. United States*, Supreme Court Number 76–6974 (order of Court issued March 21, 1977).

In the first § 2255 Motion filed, the Petitioners and their co-defendants charged ineffective assistance of counsel, based upon, "(1) A conflict of interest on the part of their trial counsel and a Government witness; (2) Counsel's 'failure' to utilize discovery procedures to identify the Government witness; and (3) Failure of their counsel to subpoena certain witnesses to testify in their defense." Additionally, they charged that the Government had used perjured testimony and that the District Court Judge should have disqualified himself from ruling on the § 2255 Petition.

Separately, the Petitioner Nathaniel Jeffers filed two motions to reduce his sentence pursuant to Rule 35, Federal Rules of Criminal Procedure. The first was filed on the 12th day of May, 1976, was denied on the 14th day of May, 1976. The second was filed on the 7th day of July, 1977, and denied on the 10th day of August, 1977.

The latest series of motions under § 2255, Title 28 of the United States Code, were filed by each Petitioner separately. Nathaniel Jeffers filed his Petition on November 8, 1977; Clinton Bush, December 12, 1977; Paul Griffin, January 20, 1978. Except for the differences in presentation of certain exhibits to the Petition, the motions filed by each Petitioner are identical.

Despite their previous efforts to set aside their convictions by direct and collateral attack, the Petitioners raise three issues not raised on direct appeal nor presented to this court on their first § 2255 motion.

■ Under § 2255, Title 28 of the United States Code, a federal prisoner may seek habeas corpus relief on three specific grounds: that his sentence violates the Constitution, laws or treaties of the United States, that the court lacked jurisdiction to impose sentence, or that the sentence exceeds the maximum authorized by law. 28 U.S.C. § 2255 (1970); see, *Davis v. United States*, 417 U.S. 333, 343, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974); *United States v. Hayman*, 342 U.S. 205, 219, 72 S.Ct. 263, 96 L.Ed. 232 (1952). The Petitioners raise neither of the latter two grounds. Rather, as to the first three issues presented, attempt to claim violations of their constitutional rights to due process of law under the Fifth Amendment and their rights to an impartial jury under the Sixth Amendment.

■■ A motion to vacate a sentence under 28 U.S.C. § 2255 was not intended to broaden or narrow the scope of collateral attack available to a prisoner prior to the enactment of § 2255 through writs of *coram nobis* and *habeas corpus*. *United States v. McNicholas*, 298 F.2d 914 (4th Cir., 1962), cert. denied, 369 U.S. 878, 82 S.Ct. 1150, 8 L.Ed.2d 280 (1962). This section does not provide routine review of convictions and sentences at the whim of a prisoner who is dissatisfied with his sentence, but is available only in the extraordinary and unusual

case. *Smith v. United States*, 277 F.Supp. 850 (Md.D.C.1967) aff'd 401 F.2d 773 (4th Cir. 1967).

■ While the doctrine of *res judicata* is not applicable to motions under § 2255, *Bennett v. United States*, 413 F.2d 237 (7th Cir., 1969); the Supreme Court in *Sanders v. United States*, 373 U.S. 1, 10, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) has formulated basic rules to guide the lower courts in their interpretation of the statutory provision that the sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner. The Court held in *Sanders* that controlling weight may be given to denial of a prior application for § 2255 relief if (1) the same ground presented in subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was made on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application. The Supreme Court further explained:

> By "ground", we mean simply a sufficient legal basis for granting the relief sought by the applicant. For example, the contention that an involuntary confession was admitted in evidence against him is a distinct ground for federal collateral relief. But a claim of involuntary confession predicated on alleged psychological coercion does not raise a different "ground" than does one predicated on alleged physical coercion. In other words, identical grounds may often be proved by different factual allegations. So also, identical grounds may often be supported by different legal arguments. *Sanders v. United States*, supra, 83 S.Ct. at 1077.

Although *Sanders* factually presented the Supreme Court with successive motions raising similar grounds, the Court went on to outline the necessary considerations to be made by a District Court considering successive applications raising different grounds:

> No matter how many prior applications for federal collateral relief a prisoner has made, the principle elaborated in subpart A [set forth above in this argument] can-

not apply if a different ground is presented by the new application. So too, it cannot apply if the same ground was earlier presented but not adjudicated on the merits. In either case, full consideration of the merits of the new application can be avoided only if there has been an abuse of the writ or motion remedy; and this the Government has the burden of pleading.

> To say that is open to the respondent to show that a second or successive application is abusive is simply to recognize that 'habeas corpus has traditionally been regarded as governed by equitable principles.' [cite omitted]. Among them is the principle that a suiter's conduct in relation to the matter at hand may disentitle him to the relief he seeks.

> . . . The principles governing those justifications [A. Successive motions on grounds previously heard and determined and B. Successive applications claimed to be an abuse of remedy] for denial of a hearing on a successive application are addressed to the sound discretion of the federal trial judges. Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits. Even as to such an application, the federal judge clearly has the power—and, if the ends of justice demand, the duty—to reach the merits. Id. at 1078–79.

Since the *Sanders* decision, Federal District Courts and Courts of Appeals have rejected consideration on the merits of successive § 2255 motions where the petitioner had failed to raise the question on a prior § 2255 motion and the record demonstrated an abuse of remedy. See, *Wapnick v. United States*, 311 F.Supp. 183 (N.Y.D.C.1969) aff'd, 423 F.2d 1361 (2nd Cir., 1969), cert. denied, 400 U.S. 845, 91 S.Ct. 90, 27 L.Ed.2d 82 (1970) (holding that the denial of a prisoner's claim on a § 2255 motion was required where the claim was known or should have been known at the time of the prisoner's prior application); but see, *Floyd*

*v. United States,* 365 F.2d 368 (5th Cir., 1966) (applying the test for abuse of remedy laid down in *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)). Numerous cases have taken the view also that where a question or issue has not been raised by a federal prisoner on appeal from his conviction, that question or issue ordinarily cannot be considered on a subsequent motion under § 2255. See, *Williams v. United States,* 344 F.2d 264 (8th Cir. 1965), cert. denied, 382 U.S. 857, 86 S.Ct. 112, 15 L.Ed.2d 95 (1965); *Hammond v. United States,* 408 F.2d 481 (9th Cir., 1969); *Haith v. United States,* 342 F.2d 158 (3rd Cir. 1965); *Allen v. United States,* 245 F.Supp. 107 (D.C.N.H.1965); *Mirra v. United States,* 379 F.2d 782 (2nd Cir., 1967), cert. denied, 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1968).

An examination of the record against the first three contentions of the Petitioners clearly established that they relied solely upon facts which were of record and known to them either prior to or during the course of the trial. Their present contentions as to the composition of the jury panel were brought into focus, as is more fully developed below, through written and oral motions and objections made by their trial counsel. Likewise, their contentions concerning the number of peremptory challenges allocated to them was presented to the trial court by their defense counsel at the commencement of, and during, voir dire examination of the prospective jurors.

■ The third previously unraised claim relates to both the voir dire examination of the prospective jurors and the monitoring of possible juror contamination during the course of the trial. The record reveals, and the Petitioners concede that defense counsel did not object to the "failure" of the trial court to continue to interrogate each juror individually each day during the course of the trial. In *Polizzi v. United States,* 550 F.2d 1133 (9th Cir., 1976) § 2255 petitioners had been convicted for use of interstate facilities as part of a scheme to acquire a Las Vegas casino in violation of Nevada law. During the trial, the press drew attention to possible underworld connections of the defendants. As a result, the trial

judge questioned the unsequestered jurors *in camera* on three occasions and found that the press had not influenced their guilty verdict. In the subsequent § 2255 motion the petitioners raised constitutional objections to the *in camera* questioning of the jurors. The Ninth Circuit determined that the nature of the *in camera* proceedings conducted in the absence of the defendants and their counsel were so obvious to counsel that the failure to object at trial was a tactical decision that waived the right to collateral attack. Likewise in this case, the "failure" to continue to inquire of each juror individually as to possible contamination during overnight recesses was so obvious that the failure to object at trial, during direct appeal and on the initial § 2255 motion that the Petitioners' right to collateral attack must be considered waived.

■ Their challenge, made over three and one-half years following the trial, to the adequacy of examination on pre-trial exposure of an allegedly tainted jury panel should not now be heard by this court. The Petitioners and defense counsel were present throughout the voir dire examination and supplemented that examination by the court with additional questions submitted to the court. These requests were honored as they were made and no further objections were raised at the trial court or appellate levels. The Petitioners have lost their claims now raised on collateral proceedings by waiving the available federal remedy of direct appeal. See, *Savage v. United States,* 547 F.2d 212, 216 (3rd Cir., 1976) (holding that the lack of objection at trial to voir dire examination precluded raising the same issue three years later in a § 2255 motion), cert. denied, 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977).

■ The remaining issue—ineffective assistance of counsel based upon the three other claims of the Petitioners discussed briefly above and more fully below—is barred from consideration under the holding of the Supreme Court in *Sanders v. United States,* supra. In the first § 2255 motion filed by these Petitioners and their co-defendants, they raised the same ground

of ineffective assistance of counsel, alleging different factual bases for their claim. In view of the allegations that are now made it is important to note that that portion of the opinion of the Seventh Circuit in their view of the denial of the first §2255 motion:

> "It is important to note, also, that when this Court said that Cohen misjudged his ethical responsibilities," Id. at 1266, it was not saying that Cohen was an 'ineffective' counsel. Cohen's decision was based upon sound tactical reasons and although in hindsight it may have been an unwise strategy, it did not result in prejudicial error. Moreover, this Court states elsewhere that the mere fact that "an attorney is unable to pursue one light of inquiry does not mean, however, that the defendant is receiving inadequate representation", Id. at 1265, *and that it found Cohen's 'competence unchallenged and . . . demonstrated by the record'* Id. at 1263." [emphasis added] *Garland Jeffers v. United States of America,* United States Court of Appeals for the Seventh Circuit, Number 76–1532, p. 3 (decided December 24, 1976) (unpublished opinion).

■ It is clear that the Seventh Circuit Court of Appeals in their review of the convictions examined the entire record to determine this same ground and made a determination on its merits. Relitigation of the same issues presented at trial and on direct appeal, whether they go under different labels or on expanded allegations that could have been made in the first instance, were not contemplated by §2255. *DeWelles v. United States,* 372 F.2d 67 (7th Cir. 1967), cert. den. 388 U.S. 919, 87 S.Ct. 2140, 18 L.Ed.2d 1365 (1967); see, *DeMaro v. Willingham,* 401 F.2d 105 (7th Cir. 1968). Where these contentions were contained in a prior §2255 motion previously denied and that decision becoming final, this court would be correct to refuse to rule upon these same contentions in this later §2255 motion. *Bennett v. United States,* 413 F.2d 237 (7th Cir. 1969), cert. den. 397 U.S. 996, 90 S.Ct. 1136, 25 L.Ed.2d 404 (1970).

Based on the foregoing authorities, it is clear that the court need not reach the merits of this petition considering the history of litigation since these Petitioners were convicted. It is within the power of this court to deny these Petitioners' §2255 motion without a hearing. See, *Stephens v. United States,* 341 F.2d 100 (10th Cir. 1965).

The Petitioners claim that blacks were systematically excluded from the jury selection panel. They further complain that the jury was not made up of persons who were their peers. To fully analyze these issues that are now raised by the Petitioners, it is necessary to review the factual setting for the trial at Lafayette.

The charges were originally brought in the Hammond Division of the United States District Court for the Northern District of Indiana. On April 11, 1974, the Petitioners and their co-defendants filed a motion for transfer from the Hammond Division, alleging extensive pre-trial publicity in the Hammond and Gary newspapers. On May 2, 1974, based upon the suggested sites for trial stated by the defendants' counsel, the court ordered the trial transferred to Lafayette, Indiana. (Docket entry No. 66, entered May 2, 1974). The Lafayette site for the trial was one suggested by counsel for the defendants.

On May 23, 1974, the defendants filed a challenge to the venire for the Hammond Division at Lafayette and requested that a special venire be drawn. The United States filed its response on June 3, 1974. On May 22, 1974, the court denied the motion.

On the first day of trial and during the course of jury selection, after the defendants had exhausted their peremptory challenges, defense counsel orally renewed the motion for a special venire, which the court denied.

■ An examination of the motion of the defendants prior to trial challenging the regular jury panel reveals that the defendants did not at that time challenge the regular selection process and its conformity with the statutory provisions of the Jury Selection and Service Act of 1968, 28 U.S.C. §1861. Rather, the defendants attempted to claim an entitlement to a jury reflecting

a representative cross-section of the community "in which they reside", that is, Gary, Indiana.

The Jury Selection and Service Act of 1968 specifically provides:

(a) In criminal cases, before the voir dire examination begins, or within seven days after the defendants discovered or could have discovered by the exercise of diligence, the grounds therefore, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

(e) The procedures prescribed by this section shall be the exclusive means by which a person accused of a federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title. *28 U.S.C. § 1867.*

It is clear from the motion that was filed by the defendants prior to trial that defense counsel had reviewed the questionnaires submitted by the prospective jurors to determine the racial composite. Thus under the clear language of the above section, the defendants had seven days from the date of their discovery to raise the grounds that blacks had been systematically excluded. However, no such ground was raised at that time. The presentation of this issue in the § 2255 motion constitutes the first effort to claim that blacks were systematically excluded.

It has been repeatedly held that the clear terms of this section precludes the type of challenge that the Petitioners now seek to make. See, *United States v. Owen,* 492 F.2d 1100 (5th Cir., 1974), cert. denied, 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180; *United States v. DeAlba-Conrado,* 481 F.2d 1266 (5th Cir. 1973); *Bumpus v. Uniroyal Tire Company, Division of Uniroyal, Inc.,* 392 F.Supp. 1405 (Pa.D.C.1975); *United States v. Rickus,* 351 F.Supp. 1386 (Pa.D.C.1972); aff'd, 480 F.2d 919 (3rd Cir.), cert. den. 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243; *United States v. Kahn,* 340 F.Supp. 485 (N.Y.D.C.1971), aff'd 472 F.2d 272 (2nd Cir.)

cert. den. 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958.

Petitioners sole basis for their claim of discrimination is founded upon the absence of any blacks from the jury panel which appeared on the first day of the trial as contrasted with the "substantial" number of blacks residing in Tippecanoe County. They impliedly claim by demonstrating "substantial under-representation of the community" by drawing from rural counties in which few blacks reside and by showing "systematic" exclusion through the history of two other trials as reported in a newspaper article, they have established a prima facie case of discriminatory purpose shifting the burden to the Government to prove that racially neutral selection criteria and procedures produced the racially disparate result. See *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *United States v. Test,* 550 F.2d 577 (10th Cir. 1976). The defendants/petitioners have failed to make out this prima facie test because of their erroneous reliance upon Tippecanoe County as the "community" against which the jury has been tested by.

The Sixth Amendment to the United States provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed.

The Jury Selection and Service Act of 1968 was passed to end a history of racial exclusion from juries, persisting against the rights afforded an accused under the Sixth Amendment and prohibited by the Fourteenth Amendment. See, 1961 Report of the United States Commission on Civil Rights, Justice 103, quoted in *Swain v. Alabama,* 380 U.S. 202 at 231, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (Goldberg, J., dissenting). The policy implemented by this statute is the random selection of jurors in such a manner as to produce a jury venire which constitutes a fair cross-section of the community in the district or division wherein the court sits.

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in which the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose. 28 U.S.C. § 1861.

No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin or economic status. 28 U.S.C. § 1862.

■ While the policy statement of Congress reflected in the above language uses the term "community", the United States submits that "community" is a term of art referring to the total populous of the division or district "wherein the court convenes", and not to a particular city or municipality within the division or district. The subsequent language of the Act reveals that that interpretation is the proper one; Inter alia:

> [The jury commission] shall insure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel; and shall ensure that each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division or combination of divisions. 28 U.S.C. § 1863(b)(3).

Pursuant to the mandate of the Act, the United States District Court for the Northern District drafted and implemented a jury selection plan which specifically provides for the selection of jurors from the seven counties constituting the Hammond-Division-at-Lafayette. (28 U.S.C. § 94 created three divisions within the Northern District of Indiana; the subdivision of the Hammond Division was made by order of the court—Rules of the United States District Court for the Northern District of Indiana, effective February 1, 1975).

Based upon the census figures available prior to the commencement of trial of the underlying criminal case, a total of seven hundred seventy-seven blacks of voting age lived in those counties out of a total population of voting age of one hundred thirty-four thousand, five hundred and seven. Based upon those figures, the number of blacks in the seven counties of the Hammond Division at Lafayette constituted 0.58 percent of the total available population for jury duty. The absence of a black on the jury panel closely corresponded, therefore, to the percentage of blacks available in the district.

■ Cases consistently hold that when there is a satisfactory demonstration of random selection, the under-representation of particular groups does not invalidate the selection process. *United States v. Greene,* 160 U.S.App.D.C. 21, 489 F.2d 1145 (1973), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974) (relating to under-representation of poor persons and young persons); *United States v. McDaniels,* 370 F.Supp. 298 (D.C.E.D.La.1973), aff'd, 509 F.2d 825 (5th Cir., 1974) (20 percent under-representation of blacks); *United States v. Whitley,* 491 F.2d 1248 (8th Cir., 1973), cert. denied, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974) (black population 2.33 percent, jury representation 28 percent); *United States v. Jenkins,* 496 F.2d 57 (2nd Cir., 1974), cert. denied, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). The mere absence of blacks from a jury panel gives no ground for upsetting a conviction. *United States v. Smith,* 521 F.2d 374 (10th Cir., 1975).

■ When the method of jury selection conforms to the federal statute, as it does in this case, the claim that the use of rural counties containing few blacks results in having so few blacks on panels that all may be removed by peremptory challenge is insufficient for reversal of conviction. See, *United States v. Conley,* 503 F.2d 520 (8th Cir., 1974). Thus the Petitioners have failed to carry forth their burden of estab-

lishing prima facie evidence of discriminatory exclusion of blacks.

Although tied to their complaint that blacks were systematically excluded from jury service in the Lafayette Division, their contention that they were entitled to a jury of their peers—or as originally put by their defense counsel, a jury representing a "cross-section of the community where the defendants resided"—can be considered a separate issue.

 The Sixth Amendment to the Constitution guarantees an impartial jury, not one demonstrating the particular characteristics that a defendant might desire. The Jury Selection and Service Act of 1968 does not provide a right for every person to serve, but provides the opportunity to be considered for service. It is clear that the Act does not intimate that parties are entitled to demand representatives of a particular race or class upon juries before whom the case is tried. See generally, *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (equal protection of the laws does not entitle a Negro to a jury containing members of his own race); *United States v. Hoffa*, 349 F.2d 20 (6th Cir., 1965), aff'd on other grounds, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1967); *Bailey v. Henslee*, 287 F.2d 936 (8th Cir., 1961), cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961) (no requirement for proportional representation of races on a jury). The fact that a defendant's case is tried in a division of a district in which there are few persons of the defendant's origin necessarily does not give ground for complaint. *United States v. Fernandez*, 480 F.2d 726 (2d Cir. 1973).

 A defendant may be indicted by a grand jury drawn from one division of the district and tried by a jury drawn from another division, without offending constitutional or statutory standards. *United States v. Joyner*, 494 F.2d 501 (5th Cir. 1974), cert. den. 419 U.S. 995, 95 S.Ct. 308, 42 L.Ed.2d 268 (1974).

 The Sixth Amendment to the United States Constitution requires that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury". Frequently, the constitutional guarantee of a fair trial comes into direct confrontation with constitutional guarantee under the First Amendment to a free press. See, *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Cf., *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242 (7th Cir., 1975). Given these sometimes conflicting constitutional mandates and general human frailties, it has long been recognized that the mandate to find "an impartial jury" does not require a clinically pure jury which has been completely isolated from knowledge about the case.

> It is not required, however, that jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or an opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court. *Irvin v. Dowd*, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961).

 Although adverse pre-trial and trial publicity may deny a defendant the right to a fair trial by an impartial jury, the trial court in most cases can prevent this result by conducting an adequate voir dire of prospective jurors (see, *United States v. Y. Hata & Company*, 535 F.2d 508, 512 (9th Cir., 1976), cert. denied, 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976) and *United States v. Ehrlichman*, 178 U.S.App.D.C. 144, 150–51, 546 F.2d 910, 916–17 (1976), cert. denied, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977)) by granting a change of venue (*Mastrian v. McManus*, 554 F.2d 813, 817 (8th Cir., 1977), cert. denied, 433 U.S.

913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977)), by sequestering the jury (*United States v. Hall*, 536 F.2d 313, 326–27 (10th Cir., 1976), cert. denied, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976) and *Mastrian v. McManus*, supra) or by providing curative instructions (*United States v. Clardy*, 540 F.2d 439, 445–47 (9th Cir., 1976), cert. denied, 429 U.S. 963, 97 S.Ct. 391, 50 L.Ed.2d 331 (1977)). See, *Sheppard v. Maxwell*, 384 U.S. 333, 358–362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

In this case, the court had granted a motion to transfer the proceedings from the Hammond-Gary area filed by the defendants. Though the defendants had moved to sequester the Lafayette jury, the court denied that motion *without prejudice* following the impanelment of the jury:

> MR. COHEN: Yes. First of all, Your Honor, I assume by the Court's action that the Motion to Sequester the jury has been denied?
>
> THE COURT: Well, it's denied for this time, Mr. Cohen. I have indicated that if during the trial it becomes apparent that there is a need for the same—that I don't find now. There's been really very minimal publicity on this case down here. I will deny the motion at this time, but I will reserve the right which I have to sequester this jury at any time that I think justice demands it, and I will do so. As I indicated to you in chambers, I will query the jury at the beginning of the sessions with regard to anyone attempting to contact them or being exposed to any publicity.

Despite the indication by the court of its willingness to reconsider the Motion to Sequester the Jury should the need arise, the matter was not raised through the remainder of the trial proceedings by the court *sua sponte* or by motion of a party. The press coverage during the course of the trial did not necessitate further consideration of the defendants' Motion to Sequester the Jury. Indeed, the entire record of this case, from commencement of the trial until the filing of the motions by these Petitioners nearly four years later, is devoid of any contemporaneous reference to the newspaper coverage by any party, belying the claims now made by the Petitioners.

The court, which in the above quoted language indicated that it had voluntarily monitored the news media coverage in the division out of a concern for the rights of the defendants, elected to extensively voir dire the jury panel concerning possible exposure to extra-judicial sources of information concerning the case.

This Judge began his voir dire examination by carefully instructing the jury that the case was to be decided on the basis of the law and the facts developed in the courtroom—not on statements in the press or on radio or television or on gossip in the streets. The Court stressed the importance of the jurors ultimately selected not be influenced by anything that may have been in the press. The court then turned to question the jury panel to determine whether any prospective jurors had heard of anything about these defendants by name before the trial.

After a detailed interrogation of some of those who indicated exposure to pre-trial publicity, the court returned to discuss in depth their responsibilities as jurors. The court advised the jury that they would be required, if selected to serve, not to expose themselves to newspaper, television or radio accounts or to expose themselves to discussions of it with anyone else, indicating the alternative of sequestering the jury. The court continued advising them that they would be admonished and instructed not to discuss the case with anyone including amongst themselves until the case was submitted to them. The Court then inquired as to whether anyone would have difficulty following that admonition.

After examination of several of the prospective jurors on other matters, the court again returned to the problems of influence by contacts with the press. The court stressed its rule that jurors are not required to answer questions posed by the press, by defense lawyers or by anyone else, considering it improper for anyone who has served as jurors and who may serve again to be interviewed by anyone. The court further

stressed that the deliberations of a jury were confidential and should remain so as an important aspect of the proper operation of the judicial system.

The court then specifically inquired of the jurors as to whether anyone had heard reference of "The Family" from any source, and engaged in extensive voir dire examination of several of those who indicated they had even the most minimal exposure to matters connected with the press. The court further inquired at some length as to the possibility that anyone or any organization by any means had attempted to contact a prospective juror concerning the case. Later the court returned to the jurors seated in the jury box and renewed its examination with all of the jurors to insure no one who heard anything from any source, would be influenced in such a way that, despite the evidence and the instructions of the court, they would not be able to give either the defendants or the Government a fair trial. The Court broadened that inquiry and examined the jurors:

"THE COURT: [I]f you were on trial here, either for the defendants or the Government—you know what's going on in your mind and conscience, would you want a jury sitting in judgment of you like you are, knowing what you are thinking; in other words, what I am asking is for you to put your feet in someone else's shoes . . .

If you were sitting here or here, on trial in this case—now, that may not be easy for you to visualize, but assume you were; you know what's going on in your mind—would you want a juror like yourself, with your conscience, with what you are thinking right now sitting in the jury box on your case?"

Following the selection of the jurors and alternates in the case, the court again returned to the question of pre-trial and trial publicity. The court instructed them that they would have to voluntarily not expose themselves to any accounts of the trials, not to talk to anyone about the case or permit anyone to talk with them. The court then specifically inquired of the jury panel selected whether any of them would have any problem or difficulty following that instruction.

As demonstrated by this brief synopsis of the voir dire examination and taken together with its examination concerning the presumption of innocence and other rights of the accused, the procedures employed by the court at the voir dire examination of prospective jurors were sufficient to safeguard the Petitioners against the effect of prejudicial pre-trial publicity, that the court protected their rights to a fair trial and met the standards set down by the Supreme Court in dealing with similar cases. See *Margoles v. United States*, 407 F.2d 727, 730 (7th Cir. 1969). The court created "an atmosphere conducive to honest admissions by the jurors", *Margoles v. United States, supra,* as demonstrated by the dialogue between the court and several prospective jurors during which the latter expressed some basis of prejudice for which the court excused them from jury duty.

When the panel was questioned as to prior knowledge of the particular defendants by name, two indicated they had received some prior information which might influence their decision for which they were excused by the court. (Juror Fogerty and Juror Jaques). Seven others indicated that their judgments might be affected by some information they had heard about "The Family" generally, for which the court excused them. (Jurors Parrish, Cochran, Sterrett, DeMoss, Joseph, Ross and Sipes).

The creation of an atmosphere conducive to honest admissions by the prospective jurors is further demonstrated by a review of the transcript relating to examination of certain jurors for matters other than pre-trial publicity which led to their excusal for cause. Twenty-three prospective jurors were excused for other reasons other than exposure to pre-trial publicity: seven were excused for religious convictions precluding them from sitting in judgment on another (Jurors Bergholt, Wraight, McFarland, Vanderkolk, Schall, Wavra, and Smith); seven prospective jurors, racial prejudice or general bias (Clinton Smith, Kirtz, Mertz, Shanks, Painton, Pearson, Atkinson); two

jurors, lack of transportation (Mull and Leusch); two female jurors, pre-school children requiring care (Shamp and Barrick); a juror who had, through his employment, dealings with narcotic substances (Wilson); a juror influenced because of her association with police (Zink); a juror affected by his prior jury service (VanMeter); and a juror who admitted that she would be unable not to talk about, or discuss, her jury experience during the trial (Briles). (Another prospective juror was excused because his residence was located outside the district, making him ineligible for jury service in the Northern District of Indiana—Shyrock.

The range of voir dire examination conducted by the court and the candor shown by the prospective jurors in their responses demonstrates the effectiveness of the voir dire examination to insure that the rights of these Petitioners were fully protected at the time of trial and that the jury ultimately selected was not tainted by the press. Out of the ninety-two prospective jurors who appeared for service on the day of trial, only eighteen ever heard of the defendants, "The Family", or anything concerning the case. Nine of those were excused by the court. The remaining nine, some of whom had only heard or read a single brief account involving the case, clearly indicated that their individual judgments would not be in any way affected or impaired because of whatever exposure they might have had. (Bergdolt, Meilner, Anglin, Holder, Miles, Hanson, Bogan and Anderson). Thus, by actions by the court *sua sponte*, the selection of an impartial jury well within the guidelines of *Irvin v. Dowd, supra,* was preserved.

The care with which the court sought on its own to insure that the defendants received an impartial trial continued throughout the several days from jury selection to submission to the jury. Although the court allowed the jurors to return to their homes each night and on the weekend, the United States Marshals provided luncheon meals in the court house for the jurors each day, by order of the court (Order entered June 18, 1974). Each day as reflected by the record in this case, the court admonished the jurors concerning possible trial publicity and questioned the jurors each morning as to any exposure they might have had. At the conclusion of the opening statements by the parties, the court admonished each of the jurors not to discuss the case, not to permit anyone to contact them and to report any contact whatsoever to the court (Monday, June 17, 1974). The following morning when the jury assembled, the court independently and separately polled each juror to determine compliance with the admonition. At the conclusion of the court proceedings on that day, the court again admonished the jurors. On Wednesday, the court collectively questioned the jury and again admonished them when the court recessed for the day. On the fourth day of trial, the court again individually polled the jurors and found that each juror as on the previous days had carefully followed the court's admonitions; the court admonished the jury again at the close of the day to avoid any contacts of trial publicity. On Friday, the court again individually polled the jurors (Friday, June 21, 1974), and admonished them to guard themselves carefully over the weekend recess.

On the following Monday morning, the court again individually and separately polled each juror to insure compliance with the court's instructions during the long separation during the weekend (Monday, June 24, 1974), and found that each had followed the court's instructions carefully. That night the court again admonished the jury to guard itself from improper influences. Throughout the remaining days of trial, the court collectively questioned the jurors at the beginning of the day and admonished them at the conclusion of the day to avoid any impropriety (Tuesday, June 25, 1974, Wednesday, June 26, 1974 and Thursday, June 27, 1974).

Notwithstanding the careful procedure and practice of the court, the Petitioners now contend:

"This court's failure to adhere to the motion by the defendants for voir dire examination individually of the jurors, created such psychological fear among them

by wholesale presence in the court that their tendency would naturally lead them to deny any knowledge or exposure to publicity of the case. For it was not 'likely that a single juror in the presence of others, would admit bias, or knowledge nor publicity (sic).'" *Motion of Petitioner Nathaniel Jeffers, Memorandum at p. 3.*

The court carefully nurtured an atmosphere conducive to honest admissions by the jurors. That atmosphere continued throughout the trial and the compliance by the jurors with the instructions of the court is reflected in the record. Juror Meilner freely advised the court that "curious neighbors were asking questions but (he) said nothing." Two other jurors admitted that they inadvertently heard radio announcements that the jury had been selected. Thereafter the record clearly reflects that the jurors followed the admonitions of the court and isolated themselves from any further contact relating to the case. This record falls far short of the circumstances involved in the legal authorities cited by the Petitioners "in support" of their position.

The Petitioners cite two Seventh Circuit cases claiming them to be precedent for reversal of their convictions, *Margoles v. United States*, 407 F.2d 727 (7th Cir., 1969) and *United States v. Solomon*, 422 F.2d 1110 (7th Cir., 1970). However, a plain reading of these opinions clearly denies the Petitioners the remedy they seek. In *Margoles*, the trial court was confronted with the publication of inadmissible testimony during the course of the trial; the collective examination of the jurors the following day revealed none had seen news accounts of that evidence. The Seventh Circuit found no reversible error:

> The procedure required by this Circuit *where prejudicial publicity is brought to the court's attention during a trial* is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to

the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further. We therefore find the District Court took adequate precautionary measures to insure petitioner's right to a fair trial. *Since no other publicity was brought to the trial court's attention, and since the court must be notified of any offensive publicity before it can be required to take the necessary precautions,* we find no further area of contention regarding the prejudicial publicity in the instant case. *Margoles v. United States,* supra, at 735. [Emphasis added.]

In *United States v. Solomon,* supra, while mildly critical of the trial court's failure to follow the procedure of *Margoles* where a trial juror indicated he had read the article referring to the defendant as a "loan shark", the Seventh Circuit nonetheless affirmed the conviction finding the newspaper account relatively innocuous compared to the more infamous cases involving pretrial and trial publicity in United States jurisprudence. The Petitioners rely upon the dissent of Judge Swygert, the sole dissenting judge on the denial of a petition for rehearing; that reliance, however, is misplaced. Unlike *Margoles* and *Solomon,* there is no indication that any trial publicity in any form came to the attention of the jurors. And the record is totally devoid of any complaints by the defense counsel or the defendants concerning the trial publicity they now claim to be prejudicial four years later. Rather, the record reflects the careful efforts of the trial court to insulate the jurors from trial publicity by sensitizing them to the needs of justice and the rights of an accused to a fair trial by an impartial jury which they scrupulously observed.

The Petitioners belatedly claim that the trial court denied them "due process of law" by refusing to grant additional peremptory challenges "after it was shown that certain members of the prospective jury panel had read or heard extensive pretrial publicity and had indicated at voir dire, that such matters were liable to affect their verdict if they were selected as jurors

on the defendants' case" (Petition of Nathaniel Jeffers, Memorandum at p. 4). A review of the record demonstrates that the Petitioners have attempted to create an issue out of whole cloth and raise it to constitutional proportions.

Prior to the commencement of jury selection, the single defense counsel for all defendants requested thirty additional peremptory challenges based solely on the number of defendants. The trial court at that time indicated that it would not grant the request unless circumstances arose during the questioning of the jury that would demonstrate the need for additional peremptory challenges.

No further request for peremptory challenges was made until the defendants had exhausted their peremptory challenges and one seat remained to be filled by the jurors. At that time, the defense counsel requested the additional challenges claiming "we had been required because of the limitation of challenges imposed on us to keep on the jury several peoples (sic) who have heard or read about the case". At that point, eleven jurors had been selected. Under the local procedure of the court known to both the Government and defense counsel, once a juror had been selected and passed without challenge, neither party is permitted to return to a juror once it is already accepted and challenge them peremptorily. Thus, defense counsel knew at the time the request for additional peremptory challenges was made that the peremptory challenges available for jurors of the regular panel (excluding alternates) could only be made against the last remaining seat. Up to that time, six of the eleven jurors already selected had indicated they had heard something concerning the case; none indicated that they had heard anything of significance and each stated that whatever they had heard would have no effect upon them (Anderson, Bogan, Holder, Meilner, Miles). (The remaining jurors who had had no exposure to any information concerning the case included Davis, Fink, Kesler, Larimer, Pickrell and Veach. In fact, an examination of the prospective jurors peremptorily challenged by the defendants indicates little concern by defense counsel with the "exposure" of

the prospective jury panel to pre-trial publicity. Only two of the ten persons challenged peremptorily by the defense counsel had even heard of the case; those two indicated that their exposure would in no way affect their deliberations (Hanson and Anglin). (The other challenges exercised by the defendants included Platt and Beam, Kesler, Moore and Huffman, Wesley and Scott, and Yerk).

As indicated above at the time the defense counsel requested additional peremptory challenges, only one seat remained to be filled of the regular jury panel. The juror whose examination had just been completed was Mrs. Larimer. Though defense counsel indicated the purpose for his request was to avoid jurors who had had exposure to pre-trial publicity, Mrs. Larimer had clearly indicated she had had no prior information concerning the case *whatsoever.* Therefore, the basis for the request for additional peremptory challenges as of that time was moot. As the court indicated in response to the request by defense counsel for additional challenges, it had exercised extremely liberal excusals to any and all jurors who gave any indication of bias or prejudice, whether from pre-trial publicity or any other source. The need for additional peremptory challenges at that time had been completely obviated by the care in which the court had examined the prospective jurors.

 Rule 24(b) of the Federal Rules of Criminal Procedure provides that in felony cases, the defendant is entitled to ten peremptory challenges and the Government to six. In multiple defendant cases, the trial court has discretion to grant additional peremptory challenges and to permit them to be exercised separately or jointly. See, *United States v. Harris,* 542 F.2d 1283, 1294–95 (7th Cir., 1976). In *United States v. Haldeman,* 181 U.S.App.D.C. 254, 559 F.2d 31 (decided October 12, 1976) (per curiam), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), the District of Columbia Circuit Court of Appeals found that the trial court had not abused its discretion in deciding to limit the number of

additional peremptory challenges granted to the defendants because of the trial court's concern about pre-trial publicity was reasonably off-set by his doubt about the wisdom of providing the defendants with a far greater number of challenges than the number granted to the Government. The District Circuit Court specifically held that in multiple defendant cases, an award of additional peremptory challenges is permissive rather than mandatory. In that case the trial court had provided the defendants, *each represented by separate counsel*, only five additional challenges. In *Harris*, where twelve defendants *were each represented by separate counsel*, the trial court had given a limited grant of seven additional challenges, for the sole reason that the defendants could not agree on the exercise of their last five peremptory challenges. No such situation arose in this case where all eight defendants were represented by a single counsel.

A peremptory challenge is exercised by a party as a matter of favor, and in the rejection, not in the selection, of jurors. *Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894); *Hanson v. United States*, 271 F.2d 791 (9th Cir., 1959). While the right of peremptory challenge has been tied to a party's interest in securing a fair and impartial jury, see, *Frazier v. United States*, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948), as a practical matter it is a tactical tool used by defense counsel to remove jurors who the defense counsel, by osmosis or otherwise, might feel would be less receptive to his style or the nature of the case and/or to increase the probabilities of selection of someone remaining in the prospective juror panel who might be more biased towards his client. In the defense of criminal cases, a defense attorney theoretically has a greater possibility of effecting the jury outcome by exercise of peremptory challenges since he need only find one juror who might be sufficiently biased towards his client to cause a hung jury. In other words, the exercise of peremptory challenges is frequently an attempt to find a biased jury. Certainly in this case, whatever motivation of defense counsel, the reason cited by counsel for additional peremptory challenges is without basis in the record. Therefore, it cannot be said that the trial court's exercise of its discretion was abusive.

The Petitioners claim that they were denied an effective assistance of counsel and as "factual" support for this ground, twice previously litigated (see above), they raise aspects of the other three grounds presented by this petition. They note the "failure" of the defense counsel to file a brief in support of the motion for a special venire because of the absence of a black from the jury panel; the failure to object to the court's "failure to adhere, to its ruling in granting all of the defendants motion for sequestration [sic]" ; and the "failure" to require the court to continue its individual interrogation of each juror each day. As demonstrated by the discussion of each of these issues above, their present bases for their claim of incompetence is unfounded and facetious. The record belies any substance to the claims of the defendants; the record fully supports the careful and skillful defense provided by their retained counsel—a fact thoroughly reviewed by this court and the Seventh Circuit Court of Appeals on the prior applications of these Petitioners.

As the records in this Court and in the Court of Appeals will show, Mr. Max Cohen is one of the most experienced criminal defense counsel in the Midwest. Based on an extensive record of experience this Judge believes he is one of the most competent. As Judge, now Mr. Justice Stevens, emphasized in the opinion on the direct appeal he served his clients in this case very well and with professional ability and vigor.

On the basis of the foregoing, the motions of the Petitioners pursuant to § 2255, Title 28 of the United States Code, are in all things DENIED without the need of an evidentiary hearing.